UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ESTATE OF JESSE AGUIRRE, | § | |
| Deceased, and BLANCA AGUIRRE, | § | |
| Individually and as Next Friend of | § | |
| Jesse Aguirre, Jr., | § | |
| | § | |
| Plaintiffs, | § | No. 5:15–CV–371–DAE |
| | § | |
| vs. | § | |
| | § | |
| CITY OF SAN ANTONIO, OFFICER | § | |
| CRISTINA GONZALES, OFFICER | § | |
| ROBERTO MENDEZ, OFFICER | § | |
| JENNIFER MORGAN, OFFICER | § | |
| BETTINA ARREDONDO, and | § | |
| OFFICER BENITO JUAREZ, | § | |
| | § | |
| Defendants. | § | |

OMNIBUS ORDER: (1) GRANTING THE OFFICERS' MOTION FOR
SUMMARY JUDGMENT; (2) GRANTING THE CITY OF
SAN ANTONIO'S MOTION FOR SUMMARY JUDGMENT; (3) DENYING AS
MOOT DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY;
AND (4) DENYING AS MOOT DEFENDANTS' MOTION TO STRIKE
<u>PLAINTIFFS' ADVISORY TO THE COURT</u>

Before the Court are four motions: (1) a Motion to Exclude the Expert

Testimony of Dr. Brant S. Mittler ("Dr. Mittler") filed by the City of San Antonio,

Police Officer Cristina Gonzales, Police Officer Roberto Mendez, Police Officer

Jennifer Morgan, Police Officer Bettina Arredondo,[1] and Police Officer Benito Juarez[2] (collectively, "Defendants") on November 4, 2016 (Dkt. # 51); (2) a Motion for Summary Judgment filed by Officers Gonzales, Mendez, Morgan, Arredondo, and Juarez (collectively, "the Officers") on November 7, 2016 (Dkt. # 52); (3) an Amended Motion for Summary Judgment filed by the City of San Antonio ("the City") on November 7, 2016 (Dkt. # 54); and (4) Defendants' Motion to Strike Plaintiffs' Advisory to the Court filed on May 16, 2017 (Dkt. # 76).

On May 11, 2017, the Court held a hearing on the summary judgment motions and motion to exclude expert testimony. Edward L. Pina, Esq. and Matthew N. Gossen, Esq. appeared on behalf of the Estate of Jesse Aguirre, Deceased ("the Estate") and Blanca Aguirre, Individually and as Next Friend of Jesse Aguirre, Jr. (collectively, "Plaintiffs"); and Nathan Mark Ralls, Esq. and Keith A. Kendall, Esq. appeared on behalf of Defendants. After careful consideration of the memoranda filed in support of and in opposition to the motions, as well as the arguments advanced at the hearing, the Court—for the

---

[1] Officer Arredondo got married and changed her name to Bettina Hernandez after the incidents at issue in the above-captioned case. However, for purposes of consistency with the pleadings and the record, she will be referred to as Officer Arredondo throughout.

[2] Other named police officers were filers of the Defendants' Motion to Exclude Expert Testimony, but have since settled out of the case. (See Dkt. # 55.)

reasons that follow—(1) **GRANTS** the Officers' Motion for Summary Judgment (Dkt. # 52); (2) **GRANTS** the City of San Antonio's Motion for Summary Judgment (Dkt. # 54); and (3) **DENIES AS MOOT** Defendants' Motion to Exclude Expert Testimony (Dkt. # 51).  In light of this Order, the Court therefore also **DENIES AS MOOT** Defendants' Motion to Strike Plaintiffs' Advisory to the Court (Dkt. # 76).

BACKGROUND

On May 8, 2015, Defendants removed the instant lawsuit to federal court pursuant to this Court's federal question jurisdiction under 28 U.S.C. § 1331. (Dkt. # 1.)  Though lacking clarity and poorly organized, Plaintiffs' complaint[3] liberally construed purports to allege the following causes of action on behalf of decedent Jesse Aguirre ("decedent" or "Aguirre"): (1) claims of excessive force, failure to provide medical care, and cruel and unusual punishment brought under 42 U.S.C. § 1983 ("Section 1983"); (2) a claim for failure to properly train, or lack of adequate training, brought under both Section 1983 and the Texas Tort Claims Act ("TTCA"), Tex. Civ. Prac. & Rem. Code § 101, et seq.; and (3) a state law claim for negligent use of handcuffs under the TTCA.  ("Compl.," Dkt. # 1-1 ¶¶ 26–52.)  These claims are asserted on behalf of Aguirre through his Estate, as

---

[3] For ease of reference, Plaintiffs' state court petition will be referred to throughout as Plaintiffs' complaint.  (See generally "Compl.," Dkt. # 1-1 at 5–21.) Furthermore, since Plaintiffs have not filed an amended complaint, the state court petition remains the operative pleading.  (See Dkt. # 52 at 2; Dkt. # 70 at 3–4.)

well as through his wife, Blanca Aguirre ("Blanca"), suing individually and as next friend of Aguirre's son, Jesse Aguirre, Jr. ("Aguirre Junior").  (Id. ¶ 3.)

The following events gave rise to Plaintiffs' suit and the instant motions.  On April 12, 2013, a 911 dispatcher of the San Antonio Police Department ("SAPD") received several calls from citizens who reported that there was a Hispanic male (later identified as Aguirre), wearing a striped polo shirt and blue jeans, crossing and walking on Highway 90, a fast-moving expressway.  (Id. ¶ 16; "Dispatch Excerpt," Dkt. # 52-4, Ex. C-1.)  According to the dispatch recordings, as the officers were traveling to and responding to the scene trying to locate Aguirre, one officer can be heard reporting that the individual had "crossed" or "stepped over" the median, dividing the westbound and eastbound traffic.  (Dispatch Excerpt at 00:52–00:58; "Gonzales Aff.," Dkt. # 52-7, Ex. F at 2.)  A few seconds later, what sounds like the same female officer can be heard telling the dispatcher that she will try to "get to him before he takes off and gets somebody . . . killed."  (Dispatch Excerpt at 01:33–01:47; Gonzales Aff. at 2.)

The 911 calls reported that a Hispanic male had been involved in a single vehicle accident, had left the scene, and was walking on the highway and appeared disoriented.  (Compl. ¶ 16.)  Aguirre's then-girlfriend, Dominique Martinez ("Martinez"), provided a statement to police about the events and the car accident leading up to Aguirre running on to the highway.  ("Martinez Statement,"

4

Dkt. # 52-2, Ex. A-1.)  Martinez stated that, on the day of the incident, Aguirre had shown up to her apartment with a beer and appeared intoxicated.  (Id. at 1.) According to Martinez, Aguirre also told her that he had been doing cocaine.  (Id.) Martinez stated that Aguirre was suicidal due to his mother's failing health and his brother's recent passing.  (Id. at 1–2.)

In the late afternoon, they left Martinez's apartment in a car together and ended up at a gas station, where Aguirre was upset and stated again that he could not live without his mom and that "if he died he was going to take [Martinez] with him."  (Id.)  According to Martinez, Aguirre was driving very fast and was intoxicated, and they were arguing because he kept saying they were both going to die, and she wanted to get out.  (Id. at 2.)  The car was going fast when it jumped the curb in a residential area, hit fences, and drove through yards; the car was badly damaged as a result.  (Martinez Statement at 2.)  Aguirre got out of the car and started running towards the highway; though Martinez yelled for him to come back, she stated that Aguirre kept running towards the freeway.  (Id.)

Tania Hernandez ("Hernandez") was speaking with family members outside her uncle's house at approximately 6:30 p.m. or 7 p.m. when they heard a loud noise coming from another aunt's house on the same street, as Aguirre's car crashed through the chain link fence.  ("Hernandez Dep.," Dkt. # 52-3, Ex. B.) Hernandez testified that she heard the sound of rims driving on concrete and saw a

couple yelling and arguing with each other until the man (Aguirre) got out and ran towards the highway.  (Id. at 9:13–18; 11:17–20.)  She also testified that she called 911 and saw Aguirre jump on to the highway, dart through cars, and jump over the center divide.  (Id. 9:19–22; 10:3–9.)  Hernandez testified that, when she was speaking to Martinez while waiting for police to arrive and trying to calm Martinez down, the smell of weed in the car was "dominant."  (Id. 30:2–12.)

Two witnesses gave statements that, once on the highway, Aguirre appeared to be "high on drugs" or "high on something" ("he wasn't in his right mind") because he was falling down and drooling, he was running through traffic and could have caused a serious accident since cars were trying to swerve to avoid hitting him, and that – even after police arrested him – it looked like he was resisting and trying to jump out in front of cars.  ("Interviews," Dkt. # 52-2, Exs. A-2, A-3.)  One witness additionally stated that it seemed the police were trying to calm Aguirre down, but he kept trying to "take off" and appeared "non-compliant." (Id.)

As to Aguirre's apprehension, when police officers reached the scene and located Aguirre along the inner median of Highway 90, three officers exited their vehicles at approximately the same time—two female officers, Officer Morgan and Officer Gonzales, pulled out their service weapons and began yelling at Aguirre, and a male officer, Officer Mendez, pulled out a taser.  (Compl. ¶ 16;

Gonzales Aff. at 2; "Mendez Aff.," Dkt. # 52-8, Ex. G at 2; "Morgan Aff.," Dkt. # 52-6, Ex. E at 3.)  The dash-cam footage from the first three responding officers' patrol cars shows steady traffic along both directions of Highway 90, though only Officer Gonzales' dash-cam captures most of the apprehension and incident itself. ("Morgan Dash-Cam," Dkt. # 52-6, Ex. E-1; "Gonzales Dash-Cam," Dkt. # 52-7, Ex. F-1; "Mendez Dash-Cam," Dkt. # 52-8, Ex. G-1.)

   The dash-cam footage shows that Officers Morgan, Gonzales, and Mendez steadily approached Aguirre, who was stumbling and refusing to stop and was still walking away from them on the westbound side of the median in the direction of oncoming traffic.  (Gonzales Dash-Cam at 03:37–04:02; Gonzales Aff. at 2; Mendez Aff. at 2–3; Morgan Aff. at 2–3.)  Officer Gonzales crossed over to the westbound side – the same side as Aguirre – while Officer Mendez and Officer Morgan approached Aguirre on the eastbound side, where their patrol vehicles were located in the far left lane nearest to the median.  (Gonzales Aff. at 2.)  The three officers grabbed Aguirre and handcuffed him with his hands behind his back; then, they pulled on his upper body and flipped him firmly over the center-divide, where he landed face up perpendicular to the median.  (Compl. ¶ 17; Gonzales Dash-Cam at 04:02–04:20; Gonzales Aff. at 3; Mendez Aff. at 3; Morgan Aff. at 3–4.)

The video shows that the three officers patted Aguirre down and lifted him up, putting him face down against the front hood of Officer Mendez's patrol car.  (Compl. ¶ 18; Gonzales Dash-Cam 04:20–04:45.)  Plaintiffs and Defendants dispute whether Aguirre was resisting during the physical interaction with the three officers, but the dash-cam footage shows that Aguirre was either swaying or shifting his weight and was moving or resisting on the hood of the patrol car. (Compl. ¶ 18; Gonzales Dash-Cam at 04:23–04:48; Mendez Aff. at 3; Morgan Aff. at 4.)  At this point, at least two other officers had arrived and surrounded the three original officers—Officers Morgan, Gonzales, and Mendez—and Aguirre, who was still restrained face down on the hood of Officer Mendez's car, with his hands handcuffed behind his back.  (Gonzales Dash-Cam at 04:45–05:34.)

Though the audio is unintelligible at this point, the dash-cam video subsequently shows a scuffle, where the officers are seen reacting to more movement from Aguirre on the hood of the car, and so Aguirre was taken to the ground.  (Id. at 05:45–06:27; Mendez Aff. at 3–4; Gonzales Aff. at 3–4; Morgan Aff. at 4.)  Aguirre is seen face down on the ground with his hands cuffed behind his back.  (Compl. ¶ 19.)  The officers' affidavits indicate Aguirre was taken down to the ground to better restrain Aguirre, since he was resisting and straining against them, and there was concern he would break free into traffic and/or hurt the officers or himself in a vehicle accident since they were all on the open highway.

8

(Mendez Aff. at 3; Gonzales Aff. at 4; Morgan Aff. at 4.)  Officer Gonzales can be seen bending Aguirre's left leg back towards his body, while Aguirre's right leg at some points remained outstretched.  (Gonzales Dash-Cam at 06:27–06:35; "Juarez Aff.," Dkt. # 52-9, Ex. H at 2.)  A female officer can be seen pressing down on Aguirre's back or shoulder area on the right side of his body—this may be Officer Morgan, given her positioning in the video footage and her affidavit indicating her positioning.  (Gonzales Dash-Cam at 06:27–07:06; Morgan Aff. at 4.)  Officer Mendez can be seen using his hand to press Aguirre's head or shoulder on the ground, keeping Aguirre still.  (Gonzales Dash-Cam at 06:40–07:18; Mendez Aff. at 4.)

        While Aguirre is face-down on the ground, he can be seen in the video moving and jerking his head around several times, from left to right, and bobbing up and down; there is still no audio through this portion.  (Gonzales Dash-Cam at 06:27–07:45; Mendez Aff. at 4; Morgan Aff. at 4.)  Whereas Plaintiffs claim that the "body weight" from the officers was unnecessary and put excessive force on Aguirre (Compl. ¶ 20), Defendants claim that they had to take Aguirre to the ground, instead of putting him in the back of a patrol car, because he was unruly and they were restraining him until medical help and a transport wagon could arrive.  (Gonzales Aff. at 4; Mendez Aff. at 3, 4; Morgan Aff. at 4.)  Plaintiffs and Defendants also dispute what happened next.  Plaintiffs maintain that, while

Aguirre was on the ground, he made several cries for help and pleaded that he could not breathe.  (Compl. ¶ 20.)  Defendants maintain that Aguirre was talking and yelling and calling out for his mom, so by implication, they believed he was able to breathe.  (Mendez Aff. at 4; Gonzales Aff. at 4; Juarez Aff. at 2.)  On the video footage, Aguirre can be heard yelling unintelligibly and moving around, and an officer yelled "stop dude."  (Gonzales Dash-Cam at 07:45–09:32.)

At this point, more than five additional officers had arrived on the scene.  Plaintiffs allege that the officers on scene were deliberately indifferent to Aguirre's physical distress and danger.  (Compl. ¶¶ 20–21.)  After a few minutes, Aguirre stopped communicating and moving.  (Compl. ¶ 21; Mendez Aff. at 4; Gonzales Aff. at 5; Juarez Aff. at 2.)  The officers holding Aguirre to the ground can be seen removing pressure from Aguirre, taking off the handcuffs, and turning him over so he was lying on his back and then sitting up.  (Compl. ¶ 22; Gonzales Dash-Cam at 11:48–13:12.)

Officer Juarez, a tactical medic on scene, ran to his car to get medical equipment when Aguirre was first turned over; it took him slightly over a minute to get the equipment and come back to Aguirre's side.  (Gonzales Dash-Cam at 11:48–13:03; "Greene Dash-Cam," Dkt. # 69-17, Ex. I at 07:00–08:00; Juarez Aff. at 2; Gonzales Aff. at 5; Mendez Aff. at 4.)  Officer Mendez can be seen conducting a "sternum rub" on Aguirre.  (Gonzales Dash-Cam at 13:42–13:44;

Mendez Aff. at 4.)  Four officers[4] began emergency resuscitation procedures, alternating chest compressions (CPR) and inserting a breathing tube, efforts which were ultimately ineffective.  (Compl. ¶ 22; Gonzales Dash-Cam 13:45-21:50; Mendez Aff. at 4; Gonzales Aff. at 5; Juarez Aff. at 2–3; Morgan Aff. at 5.) Emergency medical services ("EMS") were called and arrived at the scene, but they were also unsuccessful in reviving Aguirre.  (Compl. ¶ 23; Mendez Dash-Cam at 22:16–23:26.)

In sum, Plaintiffs allege, *inter alia*, that the Officers' actions towards Aguirre – and their failure to act when they had a duty to do so – were oppressive and represented an unconstitutional use of excessive force.  (Compl. ¶ 24.) Plaintiffs also urge that qualified immunity should be denied.  (Id.)  Plaintiffs allege that, at all times during the interaction with Aguirre, the Officers' use of force against Aguirre became "excessive, dangerous, and lethal" and exceeded the course and scope of their official duties.  (Id. ¶ 25.)  Additionally, Plaintiffs claim that Aguirre at all times was unarmed and posed no threat to the police officers on scene.  (Id. ¶ 37.)  Thus, Plaintiffs maintain that Defendants had a duty "to protect the bodily integrity [of Aguirre] and secure his constitutional rights," and that the Officers clearly violated this right when they "suffocated [Aguirre] while

---

[4] Officers Mendez, Gonzales, and Juarez are three of the four officers that can clearly be seen and identified on the video footage alternating CPR and medical treatment.  (Gonzales Dash-Cam at 13:45–21:50.)  Officer Morgan's affidavit indicates she was the other officer conducting CPR.  (Morgan Aff. at 5.)

handcuffed with his hands behind his back . . . on the ground in a prone position with excessive weight on him restricting his ability to breathe." (Id. ¶ 36.) Finally, Plaintiffs maintain that the City is liable for the Officers' torts and constitutional violations under a theory of *respondeat superior*. (Id. ¶ 47.)

On November 4, 2016, Defendants filed the instant Motion to Exclude Expert Testimony of Dr. Mittler. (Dkt. # 51.) On November 11, 2016, Plaintiffs filed a response in opposition (Dkt. # 58), which was subsequently supplemented on November 17th to correct an exhibit (Dkt. # 62). On November 18, 2016, Defendants filed their reply. (Dkt. # 63.) Additionally, on November 7, 2016, the Officers filed their Motion for Summary Judgment ("Officers' MSJ") (Dkt. # 52), and the City of San Antonio filed its own Motion for Summary Judgment ("City's MSJ") (Dkt. # 54). On January 9, 2017, Plaintiffs filed a combined response in opposition to both summary judgment motions (Dkt. # 66), which was later amended and corrected (Dkts. ## 69, 70).[5] On January 17, 2017, Defendants filed their reply. (Dkt. # 71.)

---

[5] For clarity, the Court notes that it will cite Dkt. # 70 for Plaintiffs' combined response brief to Defendants' motions for summary judgment, but the brief's exhibits will be cited from Dkt. # 69 because the motion docketed at Dkt. # 70 only added a signature and did not re-file the exhibits.

## LEGAL STANDARD

I.    <u>Summary Judgment</u>

A court must grant summary judgment when "the movant shows that
there is no genuine dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(a); <u>see also</u> <u>Meadaa v. K.A.P.</u>
<u>Enterprises, L.L.C.</u>, 756 F.3d 875, 880 (5th Cir. 2014).  "Substantive law will
identify which facts are material."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242,
248 (1986).  A dispute is only genuine "if the evidence is such that a reasonable
jury could return a verdict for the nonmoving party."  <u>Id.</u>

In seeking summary judgment, the moving party bears the initial
burden of demonstrating the absence of a genuine issue of material fact.  <u>Celotex</u>
<u>Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  If the moving party meets this burden,
the nonmoving party must come forward with specific facts that establish the
existence of a genuine issue for trial.  <u>Distribuidora Mari Jose, S.A. de C.V. v.</u>
<u>Transmaritime, Inc.</u>, 738 F.3d 703, 706 (5th Cir. 2013) (quoting <u>Allen v. Rapides</u>
<u>Parish Sch. Bd.</u>, 204 F.3d 619, 621 (5th Cir. 2000)).  "Where the record taken as a
whole could not lead a rational trier of fact to find for the non-moving party, there
is no genuine issue for trial."  <u>Hillman v. Loga</u>, 697 F.3d 299, 302 (5th Cir. 2012).

In deciding whether a fact issue has been created, "the court must
draw all reasonable inferences in favor of the nonmoving party, and it may not

make credibility determinations or weigh the evidence." <u>Kevin M. Ehringer</u>

<u>Enters. v. McData Servs. Corp.</u>, 646 F.3d 321, 326 (5th Cir. 2011) (quoting <u>Reeves</u>

<u>v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000)).  However,

"[u]nsubstantiated assertions, improbable inferences, and unsupported speculation

are not sufficient to defeat a motion for summary judgment." <u>United States v.</u>

<u>Renda Marine, Inc.</u>, 667 F.3d 651, 655 (5th Cir. 2012) (quoting <u>Brown v. City of</u>

<u>Hous.</u>, 337 F.3d 539, 541 (5th Cir. 2003)).

       "Although we review evidence in the light most favorable to the non-

moving party, [the Fifth Circuit] assign[s] greater weight, even at the summary

judgment stage, to the facts evident from the video recordings taken at the scene."

<u>Carnaby v. City of Hous.</u>, 636 F.3d 183, 187 (5th Cir. 2011).  "A [court] need not

rely on plaintiff's description of the facts where the record discredits that

description but should instead consider 'the facts in the light depicted by the

video.'" <u>Id.</u> (quoting <u>Scott v. Harris</u>, 550 U.S. 372, 381 (2007)).

DISCUSSION

I.    <u>The Officers' Motion for Summary Judgment</u>

       The Officers move for summary judgment on Plaintiffs' Section 1983

claims for (1) excessive force, (2) failure to provide medical care, and (3) cruel and

unusual punishment, as well as on Plaintiffs' claim of negligent use of handcuffs

under the Texas Tort Claims Act ("TTCA").  (Dkt. # 52 at 5–20.)  The Officers

14

assert the affirmative defense of qualified immunity against the Section 1983 claims, claiming each of the individually named Officers is entitled to qualified immunity for the alleged conduct.  (Id. at 4–5.)  First, however, the Officers challenge as a matter of law – and to the extent a survivorship claim is even pled – the Estate's capacity to bring survivorship claims under Section 1983.  (Id. at 2–3.)

A. The Estate's Capacity to Bring Survivorship Claims

The Officers' MSJ first argues that – to the extent the complaint attempts to bring survivorship claims on behalf of the decedent's Estate – such claims should be dismissed as a matter of law because only an estate's properly-appointed legal representative can bring a survival action, and here the Estate is not properly represented.  (Dkt. # 52 at 3.)  Plaintiffs disagree.  They argue that Plaintiffs have properly pled causes of action on behalf of the decedent because personal injury actions under Texas law survive to and in favor of "heirs, legal representatives, and [the] estate of the injured person," and here, Plaintiff Blanca Aguirre, decedent's spouse, is suing in her representative capacity on behalf of the Estate.  (Dkt. # 70 at 4.)

"A comprehensive federal statute covering survival of actions arising under federal law does not exist."  Hamilton v. Rogers, 573 F. Supp. 452, 453 (S.D. Tex. 1983).  The survival of Section 1983 claims after a decedent's death is

governed by 42 U.S.C. § 1988 ("Section 1988").[6]  Id.  Section 1988 "recognizes that in certain areas, the federal civil rights laws are 'deficient in the provisions necessary to furnish suitable remedies,' and in such instances federal courts are directed to adopt state law insofar as it is not inconsistent with federal law."  Id. (quoting Section 1988).  Accordingly, the Court looks to Texas law for standing and capacity rules regarding survivorship claims.

The Texas Supreme Court has stated that "a decedent's action survives his death and may be prosecuted in his behalf.  [Thus] [t]he survival action, as it is sometimes called, is wholly derivative of the decedent's rights." Russell v. Ingersoll-Rand Co., 841 S.W.2d 343, 345 (Tex. 1992).  "The parties to a survival action seek adjudication of *the decedent's own* claims for the alleged injuries inflicted upon [him] by the defendant."  Austin Nursing Ctr., Inc. v. Lovato, 171 S.W.3d 845, 850 (Tex. 2005).  Moreover, because "a decedent's survival claim becomes part of [his] estate at death," the estate retains a justiciable interest in the survival action, which is sufficient to confer standing.  Id.

Here though, the issue raised by the Officers is not whether Aguirre's Estate has standing to sue, but whether the Estate has the capacity to sue—under Texas law, both are needed.  See Coastal Liquids Transp., L.P. v. Harris Cty. Appraisal Dist., 46 S.W.3d 880, 884 (Tex. 2001) (holding that a plaintiff must have

_____

[6] The complaint mentions Section 1988, though only in the context of requesting attorneys' fees and costs thereunder.  (See Compl. ¶ 2.)

both standing and capacity to bring a lawsuit).  A decedent's estate "is not a legal entity and may not properly sue or be sued as such."  Price v. Estate of Anderson, 522 S.W.2d 690, 691 (Tex. 1975).  Rather, because an estate – akin to a minor or incompetent – lacks legal authority to sue, the law "grants another party the capacity to sue on their behalf."  Austin Nursing, 171 S.W.3d at 849.  Generally, only an estate's personal representative has the capacity to bring a survivorship or survival claim.  Frazier v. Wynn, 472 S.W.2d 750, 752 (Tex. 1971); Shepherd v. Ledford, 962 S.W.2d 28, 31 (Tex. 1998).

The Officers argue that, as set forth in the complaint, the Estate is not properly represented, and therefore does not have capacity to bring survivorship claims on behalf of Aguirre.  (Dkt. # 52 at 3.)  Moreover, even acknowledging that there are limited instances under Texas law where an heir of a decedent may sue on behalf of an estate, the Officers argue that Blanca Aguirre has not met the requirements to indicate that she is an heir who may bring suit on behalf of the Estate.  (Id.; see also Shepherd, 962 S.W.2d at 31–32.)  The Texas Supreme Court has reiterated that, in its previous decision in Shepherd, it held that "'[h]eirs at law can maintain a survival action suit during the four-year period the law allows for instituting administration proceedings if they allege and prove that there is no administration pending and none [is] necessary.'"  Austin Nursing, 171 S.W.3d at

850–851 (discussing the holding of <u>Shepherd</u> in the context of whether an heir has capacity to bring a survival suit on behalf of an estate).

Without citing legal authority, Plaintiffs respond that – because in Texas the "lawful spouse of a decedent is the community administrator of all affairs until and unless a different person has been appointed by a probate court" – Blanca is suing in her representative capacity on behalf of the Estate. (Dkt. # 70 at 4.)  In support, Plaintiffs' response attaches as an exhibit Blanca's timely application for administration of Aguirre's estate, filed in or around July 20, 2016, in probate court.  (Dkt. # 69-4, Ex. 3.)

The Court finds that the Estate does not have capacity to sue Defendants, and that furthermore, Blanca Aguirre has not satisfied the requirements of an heir at law to sue on behalf of the Estate.  First, the complaint clearly states that "Plaintiffs in this action are the ESTATE OF JESSE AGUIRRE, DECEASED, [and] BLANCA AGUIRRE, INDIVIDUALLY AND AS NEXT FRIEND OF JESSE AGUIRRE, JR."  (Compl. ¶ 3.)  Because an estate is not an entity that has capacity to sue on its own, simply naming "the Estate of Jesse Aguirre" is not sufficient to make the Estate a proper plaintiff.  See <u>Price</u>, 522 S.W.2d at 691.  Moreover and critically, nowhere in the complaint do Plaintiffs allege, state, or define that the Estate has a properly appointed representative suing on its behalf.

18

Instead for example, the "ESTATE OF JESSE AGUIRRE, DECEASED" purportedly brings claims in paragraph 27 of the complaint for, *inter alia*, damages for pain and suffering, lost income, and funeral expenses. (Compl. ¶ 27.) A plain reading of these allegations is that the Estate itself, and not a properly appointed representative, is bringing survivorship claims on behalf of Aguirre. Absent the Estate's proper representation through a personal representative or, in limited circumstances, an heir at law, "the Estate" as a legal construct is not permitted to bring these claims by law. See Frazier, 472 S.W.2d at 752; Shepherd, 962 S.W.2d at 31–32.

The Estate is also indirectly referenced in paragraph 45 of the complaint to indicate that Blanca and Aguirre Junior, "*as legal heirs of the deceased's estate*," have the right to recover for the survivorship claims *they themselves* are bringing on behalf of Aguirre. (Compl. ¶ 45 (emphasis added).) But again, without any allegation or assertion in the complaint that the Estate has a proper representative who is bringing the claims *on the Estate's behalf*, any claims purportedly brought by the Estate must necessarily be dismissed as a matter of law for lack of proper representation, and therefore, lack of capacity. See Frazier, 472 S.W.2d at 752; Shepherd, 962 S.W.2d at 31.

Additionally, the fact that Blanca Aguirre filed for "Administration and Determination of Heirship" in probate court directly contradicts the

19

requirement that, in limited cases, an heir at law – which Blanca Aguirre

undisputedly is – may bring a survival action on behalf of an estate if she

"'allege[s] and prove[s] that there is no administration pending and none [is]

necessary.'"  See Austin Nursing, 171 S.W.3d at 850–51 (quoting Shepherd, 962

S.W.2d at 31–32).  On the basis of the state court petition itself, which is the

operative pleading and was filed on April 13, 2015, the complaint does not allege,

demonstrate, or even address whether or not there is an estate administration

pending for Aguirre, much less whether one was necessary.  (See Dkt. # 1.)  To the

contrary, her filing in probate court seems to clearly demonstrate that an

administration of Aguirre's estate is both pending and necessary because Aguirre

died intestate.  (See Dkt. # 70 at 4; Dkt. # 69-4, Ex. 3.)

       Accordingly, the Court finds that "the Estate of Jesse Aguirre" is not

properly represented in this lawsuit and thus lacks capacity to bring survivorship

claims on behalf of decedent.  Therefore, "THE ESTATE OF JESSE AGUIRRE,

DECEASED" **shall be removed from the caption and any and all claims**

**purportedly brought by the Estate as a plaintiff are dismissed.**  Blanca Aguirre,

suing individually and as next friend of her son, Aguirre Junior, is the sole

remaining plaintiff in the above-captioned case.

B. <u>Section 1983 Claims for Excessive Force, Failure to Provide Medical
Care, and Excessive Punishment and Execution</u>

Plaintiffs' complaint alleges claims against the Officers under 42
U.S.C. § 1983 ("Section 1983") of (1) unconstitutional use of excessive force,
(2) failure to provide medical care, and (3) excessive punishment and execution.
(Compl. ¶¶ 35–40, 42–50.)

Section 1983 "provides a private right of action for redressing
violations of federal law committed by persons acting under the color of state law."
<u>Estrada v. City of San Benito, Tex.</u>, Civil Action No. B-08-116, 2009 WL 54895,
at *3 (S.D. Tex. Jan. 8, 2009) (citations omitted).  "To prevail on a claim under
[Section 1983], a plaintiff must show that a defendant amenable to suit under the
statute deprived plaintiff of a constitutional right."  <u>Id.</u> (citing, *inter alia*, <u>Casanova
v. City of Brookshire</u>, 199 F. Supp. 2d 639, 649 (S.D. Tex. 2000)); <u>see also</u> <u>Doe v.
Rains Cty. Indep. Sch. Dist.</u>, 66 F.3d 1402, 1406 (5th Cir. 1995).  Additionally, the
alleged constitutional deprivation must have been due to deliberate indifference;
"[t]he negligent deprivation of life, liberty, or property is not a constitutional
violation."  <u>Campbell v. City of San Antonio</u>, 43 F.3d 973, 977 (5th Cir. 1995).

The Officers move for summary judgment on Plaintiffs' Section 1983
claims of (1) excessive force, (2) failure to provide medical care, and (3) excessive
punishment and execution, and have pled the defense of qualified immunity.  (Dkt.

# 52 at 4–5.)  In response, Plaintiffs argue that Defendants should be denied qualified immunity because Officers Gonzales, Mendez, Morgan, Arredondo, and Juarez "deviated from their expected protocols and caused Jesse Aguirre's death [and are] therefore not shielded from liability."  (Dkt. # 70 at 6.)

      1.  <u>Qualified Immunity</u>

      The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)); <u>Bush v. Strain</u>, 513 F.3d 492, 500 (5th Cir. 2008); <u>Bazan ex rel. Bazan v. Hidalgo Cty.</u>, 246 F.3d 481, 488 (5th Cir. 2001). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law."  <u>Thompson v. Mercer</u>, 762 F.3d 433, 436–37 (5th Cir. 2014).

      "A qualified immunity defense alters the usual summary judgment burden of proof."  <u>Brown v. Callahan</u>, 623 F.3d 249, 253 (5th Cir. 2010).  Once an official pleads the defense of qualified immunity, "the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law."

Id.; see also Harris v. Serpas, 745 F.3d 767, 771 (5th Cir. 2014).  Thus, "[t]he plaintiff bears the burden of negating qualified immunity . . . but all inferences are drawn in his favor."  Brown, 623 F.3d at 253.  A plaintiff cannot meet this burden by resting on the pleadings; instead, a plaintiff must demonstrate genuine issues of material fact regarding the reasonableness of a defendant's conduct.  Bazan, 246 F.3d at 490.

There are two well-established steps in the qualified immunity analysis: a court decides "(1) whether the undisputed facts and the disputed facts, accepting the plaintiff's version of the disputed facts as true, constitute a violation of a constitutional right; and (2) whether the defendant's conduct was objectively reasonable in light of clearly established law."  Carroll v. Ellington, 800 F.3d 154, 169 (5th Cir. 2015).  The court applies "current law to the first step and the law at the time of the incident to the second step."  Bush, 513 F.3d at 500 (internal quotations and citation omitted).  Nonetheless, a government official's acts are not objectively unreasonable unless *all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the plaintiff's rights.  Carroll, 800 F.3d at 169.  Finally, a district court has discretion to address the prongs of qualified immunity in any order.  Pearson, 555 U.S. at 236; Brown, 623 F.3d at 253 ("A court may rely on either prong of the defense in its analysis.").

a.  <u>Excessive Force Claim</u>

Plaintiffs have alleged a Section 1983 excessive force claim against the Officers, maintaining that the Officers "unnecessarily escalated their force" by suffocating Aguirre "while handcuffed with his hands behind his back, face down on the ground in a prone position with excessive weight on him restricting his ability to breath."  (Compl. ¶¶ 36, 37.)  The Officers argue they are entitled to qualified immunity because at all times relevant to their attempt to take and maintain control of Aguirre on Highway 90 "they were acting within their discretionary authority and within the course and scope of their employment with the San Antonio Police Department [and] their actions were objectively reasonable."  (Dkt. # 52 at 5.)

Under the first prong of qualified immunity, a court determines whether the plaintiff has alleged a violation of a statutory or constitutional right. <u>Carroll</u>, 800 F.3d at 169.  "All claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."  <u>Graham v. Connor</u>, 490 U.S. 386, 396–97 (1989). It is well-established in the Fifth Circuit that, to state a claim for excessive force, a plaintiff must allege: "(1) an injury, (2) which resulted directly and only from the use of force that was clearly excessive; and (3) the excessiveness of which was

24

clearly unreasonable."  Ramirez v. Knoulton, 542 F.3d 124, 128 (5th Cir. 2008).

Plaintiffs have alleged an excessive force claim, maintaining that Aguirre's

suffocation and consequent death resulted directly from excessive pressure and

force applied to his body by the Officers when he was on the ground handcuffed

and face-down.  The Officers dispute the allegation that the force used was

excessive or unreasonable.

   Because viewing the Officers' conduct in the light most favorable to

Plaintiffs the Court finds that the Officers' use of force was objectively reasonable

in light of clearly established law at the time the challenged conduct occurred, the

Court addresses this issue first.  See Carroll, 800 F.3d at 169.  In determining the

objective reasonableness of force used in a certain situation, the court "'must

balance the amount of force used against the need for force.'"  Carnaby, 636 F.3d

at 187–88 (quoting Ramirez v. Knoulton, 542 F.3d 124, 129 (5th Cir. 2008)).

   The "[u]se of deadly force is not unreasonable when an officer would

have reason to believe the suspect poses a threat of serious harm to the officer or

others."  Mace v. City of Palestine, 333 F.3d 621, 624 (5th Cir. 2003).  The inquiry

is fact-specific and "must be judged from the perspective of a reasonable officer on

the scene, rather than with the 20/20 vision of hindsight."  Graham, 490 U.S. at

396–97.  The following non-exclusive factors are also pertinent to the inquiry:

"(1) whether the suspect was armed; (2) whether the suspect posed an immediate

threat to the safety of the officers or the public; (3) whether the suspect resisted

arrest; (4) whether a warrant was employed and the severity of the crime for which

the suspect was to be arrested; (5) whether more than one suspect or police officer

was involved; and (6) whether other dangerous or exigent circumstances existed at

the time of arrest." Goldman v. Williams, 101 F. Supp. 3d 620, 648 (S.D. Tex.

2015) (citing, *inter alia*, Graham, 490 U.S. at 396; Brown v. Glossip, 878 F.2d

871, 874 (5th Cir. 1989)).

       Under these non-exclusive factors – and considering the

uncontroverted facts and events as depicted in the dash-cam video, as the Court is

permitted to do, see Carnaby, 636 F.3d at 187 – the Court finds that each of the

Officers' conduct was objectively reasonable, entitling Officers Gonzales, Mendez,

Morgan, Juarez, and Arredondo to qualified immunity on the Section 1983

excessive force claim.  Where the Officers' actions are distinguishable, the Court

must assess qualified immunity individually and has come to its conclusion for

each of them as follows.  See Meadours v. Ermel, 483 F.3d 417, 422 (5th Cir.

2007) (noting that the Fifth Circuit requires that the actions of defendants be

examined individually in the qualified immunity context (internal citations

omitted)).

26

i.  Officer Gonzales

Although Plaintiffs' account of events suggests that Aguirre "posed
no resistance or threat to the officers" (Compl. ¶¶ 16, 18, 37), the dash-cam footage
shows otherwise, and the Court is permitted on summary judgment to "consider
'the facts in the light depicted by the video,'" rather than rely solely on Plaintiffs'
descriptions.  See Carnaby, 636 F.3d at 187 (quoting Scott, 550 U.S. at 381).
Viewing the undisputed facts and the disputed facts in the light most favorable to
Plaintiffs, the Court finds the following facts material and relevant[7] to its
conclusion that Officer Gonzales' conduct was objectively reasonable.

The dash-cam footage shows: (1) that there was a steady flow of fast-
moving traffic on both sides of the Highway 90 median throughout the interactions
with and apprehension of Aguirre (Gonzales Dash-Cam at 03:27–07:06; Greene
Dash-Cam starting at 00:38); (2) that Aguirre was swaying or could not keep
himself upright while being led to the hood of Officer Mendez's patrol car after
being handcuffed (Gonzales Dash-Cam at 04:24–04:38); (3) that Aguirre was still
struggling and resisting against Officer Mendez and Morgan when he was placed
face-down on the hood of Officer Mendez's patrol car (id. at 04:38–06:20); (4) that

_____

[7] Because the five Officers were present at the same scene, the Court incorporates
and applies its analysis of the circumstances surrounding Aguirre's arrest,
apprehension, and take-down to each officer's qualified immunity analysis
hereafter.  Where relevant, any conduct specifically attributable to an individual
officer is addressed separately, as well.

Aguirre continued to strain and bob up and down when he was face-down on the pavement, even as officers ordered him to "stop" (id. at 06:20–08:22); and (5) that Aguirre, while he was face-down on the ground, continued to yell and move his head from left to right, as well as his body, as several officers were above him trying to restrain his movements while they awaited a police escort wagon (id. at 08:22–10:23).

Thus, "from the perspective of a reasonable officer on the scene" – as opposed to 20/20 hindsight, Rockwell v. Brown, 664 F.3d 985, 991 (5th Cir. 2011) – Aguirre was actively resisting, not following law enforcement commands, and posed a serious threat to himself, the officers, and the motorists on the highway. See Graham, 490 U.S. at 396–97.  It was objectively reasonable for Officer Gonzales to believe that Aguirre "posed an immediate threat to the safety of the officers or the public."  See Goldman, 101 F. Supp. 3d at 648.  Therefore, under the totality of the circumstances, Officer Gonzales' conduct in (1) arresting and handcuffing Aguirre, (2) moving him over the median to the eastbound side of the highway so as not to be separated from the officers assisting her, (3) taking Aguirre down to the ground after he was struggling against the hood of the patrol car, and (4) holding Aguirre's legs to prevent him from kicking was objectively reasonable.

Moreover, in light of the fact that Officer Gonzales initially had to climb over the Highway 90 median herself and walk on the westbound side, facing

fast-moving oncoming traffic head on in order to follow Aguirre, who was walking away from her, the Court finds that "dangerous and exigent circumstances" were present to justify Officer Gonzales' reasonable use of force.  See Goldman, 101 F. Supp. 3d at 648 (citing Graham, 490 U.S. at 396 and Glossip, 878 F.2d at 874).  In circumstances this Court finds were unambiguously "tense, uncertain, and rapidly evolving" – and in the absence of controverting summary judgment evidence that Plaintiffs have the burden to raise – Officer Gonzales' "split-second judgment" of the use of force necessary to securely restrain Aguirre in the middle of a busy highway to ensure he would not break away and run into traffic while the officers were waiting for a police escort wagon will not be second-guessed.  See Graham, 490 U.S. at 397.

        In fact, rather than demonstrate a genuine fact issue as to the reasonableness of Officer Gonzales' conduct, Plaintiffs' exhibits of Officer Gonzales' deposition and official statement largely corroborate Officer Gonzales' affidavit, all of which describe: (1) the dangerousness of the situation on the highway, not only to Aguirre but also to the officers, (2) Aguirre's continuing resistance, from arrest to the hood of the patrol car to the ground, and (3) her concern that Aguirre could cause a major accident or get people killed if he ran into traffic unexpectedly.  (See Dkt. # 69-10, Ex. B; Dkt. # 69-14, Ex. F.)

Plaintiffs also attempt to argue that the force used on Aguirre was excessive on the basis of, *inter alia*, a 1995 DOJ Bulletin that describes the symptoms of "Positional Asphyxia-Sudden Death" (Dkt. # 69-6, Ex. 5) and excerpts from the SAPD's General Manual that prohibit "hog-tying."  (Dkt. # 69-5, Ex. 4; Dkt. # 69-7, Ex. 6.)  Procedure 601 ("Prisoners") of the SAPD General Manual states in part that "[a] prisoner is entitled to reasonable protection while under arrest [and] [o]fficers use reasonable care and diligence to preserve the lives, health, and safety of prisoners."  (Dkt. # 69-5, Ex. 4.)  However, even taking this evidence in the light most favorable to Plaintiffs, see McData Servs. Corp., 646 F.3d at 326, this evidence is not sufficient to create a genuine dispute of material fact regarding the objective reasonableness of Officer Gonzales' conduct at the scene "in light of the facts and circumstances confronting" her.  See Graham, 490 U.S. at 397 (citing Scott, 436 U.S. at 137–39).

Because Plaintiffs have not met their burden of rebutting the qualified immunity defense, which is a "demanding standard," see Vincent v. City of Sulphur, 805 F.3d 543, 547 (5th Cir. 2015), **Officer Gonzales is entitled to qualified immunity on the excessive force claim.**

## ii.  Officer Mendez

Officer Mendez's conduct was similarly objectively reasonable.  In light of Aguirre's continued resistance, even after being handcuffed and put on the

hood of Officer Mendez's patrol car, it was objectively reasonable for Officer

Mendez to take Aguirre to the ground to "put him at a disadvantage and better

restrain him," so that Aguirre would not "break away and run into traffic and hurt

himself, the officers at the scene, or the motorists . . . on Highway 90."  (See

Mendez Aff. at 3–4.)  Moreover, contrary to Plaintiffs' claim that the officers

deviated from their expected protocols by taking Aguirre to the ground instead of

placing him into the back of a patrol car (see Dkt. # 70 at 6, 10), Plaintiffs' own

proffered summary judgment evidence shows that SAPD officers have discretion

to decide whether to transport "unruly and combative prisoners" in prisoner

transport wagons.  (See Dkt. # 69-5, Ex. 4.)  This is precisely the calculation and

decision that Officer Mendez made; a transport wagon for Aguirre was indeed

called.  (See Mendez Aff. at 3.)

       Additionally, once on the ground, the dash-cam video clearly shows

Officer Mendez supporting himself on his left leg, and using mostly his hands to

keep Aguirre's head and upper shoulders still; Officer Mendez's affidavit states he

did so to "prevent [Aguirre] from hurting himself" because Aguirre was "twisting

and jerking his head from side to side . . . and bobbing it up and down."  (Id. at 4;

Gonzales Dash-Cam at 06:30–08:30.)  Officer Mendez's restraint of Aguirre on the

ground was reasonable because Office Mendez had reason to believe Aguirre

posed a serious and immediate threat due to his wandering on the highway

erratically and his resistance to officer commands.  See Goldman, 101 F. Supp. 3d at 648 (citing Graham, 490 U.S. at 396 and Glossip, 878 F.2d at 874).  Though the dash-cam footage shows periods of less movement from Aguirre while he was face-down on the ground, it is not for this Court to assess the scene with the clear hindsight of 20/20 vision, see Graham, 490 U.S. at 396–97, especially where the uncontroverted summary judgment evidence demonstrates the Officers were concerned about Aguirre's safety, their own safety, and the safety of the motorists driving on the road and the high potential for an accident to occur.  (See, e.g., Mendez Aff. at 3–4; Gonzales Aff. at 2–4; Morgan Aff. at 2–5.)

Therefore, where the court "'must balance the amount of force used against the need for force,'" the Court finds that Officer Mendez acted objectively reasonably in restraining Aguirre first on the hood of his patrol vehicle, and then on the ground while awaiting transport.  See Carnaby, 636 F.3d at 187–88. Because Plaintiffs have not met the "demanding standard" of showing Officer Mendez acted "objectively unreasonabl[y] in light of clearly established rule of law," see Vincent, 805 F.3d at 547, **Officer Mendez is entitled to qualified immunity on the excessive force claim.**

### iii.  Officer Morgan

Officer Morgan's conduct was also objectively reasonable.  Officer Morgan's affidavit states that when she saw Aguirre he appeared to be "on drugs

or some other substance because he appeared disoriented and not in his right state of mind." (Morgan Aff. at 2.) In light of these observations and his erratic behavior, and in light of Aguirre's location – right past the crest of Highway 90 where it was difficult for oncoming cars to see the officers and Aguirre – Officer Morgan acted objectively reasonably when (1) she helped pull Aguirre over the median after Officer Gonzales handcuffed him, and (2) she assisted in taking Aguirre down to the ground from the hood of Officer Mendez's patrol car to better secure Aguirre because "he was very strong," and she did not feel like they had him secure; Aguirre kept resisting and bracing himself to gain leverage against the officers' bodies. (Id. at 2–4.)

From the dash-cam footage, it is difficult to assess how much pressure, if any, Officer Morgan was placing on Aguirre to help restrain him when he was face-down on the ground. (See, e.g., Gonzales Dash-Cam at 06:30–07:15.) Her affidavit indicates – and the video does show – that she was on Aguirre's right side (the side furthest from the dash-cam), and she believes she might have been holding on to Aguirre's elbow or hand with one of her hands. (Id. at 4.) Because this alone is not excessive force, and Plaintiffs have not otherwise provided sufficient evidence to create a genuine dispute of material fact that Officer Morgan acted objectively unreasonably – as they must do to overcome the qualified

immunity defense, see Brown, 623 F.3d at 253 – the Court finds that **Officer Morgan is entitled to qualified immunity on the excessive force claim.**

iv.  Officer Juarez

Officer Juarez's conduct was objectively reasonable, as well.  Officer Juarez, who is a Tactical Medic with the SAPD and has an EMT license, arrived on scene after being notified that officers were struggling to detain Aguirre on eastbound Highway 90.  (Juarez Aff. at 1.)  The dash-cam footage shows that Officer Juarez, given the number of patrol cars already at the scene, had to park at least two car-lengths away from where Aguirre was on the ground.  (Green Dash-Cam at 01:40–01:57.)  Officer Juarez arrived and observed that Aguirre was handcuffed on the ground with an officer holding his legs, and that Aguirre was "yelling and thrashing."  (Juarez Aff. at 2; Gonzales Dash-Cam at 07:30–08:09.)

After a few minutes of being on the scene, Officer Juarez can be seen looking away because – according to him and Officer Morgan – a vehicle accident had also just occurred on the right-hand shoulder of the highway.  (Juarez Aff. at 2; Morgan Aff. at 5.)  The Court finds that the occurrence of this accident further indicates the danger and severity of the officers and Aguirre being outside of their vehicles on an active roadway in a tense, unpredictable situation.  See Graham, 490 U.S. at 396.  In any event, the video footage clearly shows that Officer Juarez did not participate in or take part in any restraint on Aguirre, and in fact, only stepped

34

in to interact with Aguirre to give him emergency medical treatment when officers

noticed he was not breathing and turned him over.  (Gonzales Dash-Cam at 07:30–

12:05; Juarez Aff. at 2–3.)

   Therefore, because Plaintiffs have not provided sufficient, let alone

any, evidence that Officer Juarez used excessive force on Aguirre, they have not

met their burden of rebutting the defense of qualified immunity by showing a

genuine fact issue as to the objective reasonableness of Officer Juarez's conduct.

See Brown, 623 F.3d at 253; Bazan, 246 F.3d at 490.  Accordingly, **Officer**

**Juarez is entitled to qualified immunity on the excessive force claim.**

#### v.  Officer Arredondo

   Finally, Officer Arredondo's conduct was also objectively reasonable.

From the dash-cam footage it appears that Officer Arredondo was the fourth

officer to arrive at the scene after Officers Gonzales, Mendez, and Morgan

arrested, handcuffed, and pulled Aguirre over the median to the eastbound side.

(Gonzales Dash-Cam at 04:42.)  While Officer Gonzales was calling dispatch to

provide an update, Officer Arredondo can be seen conferring with Officers

Mendez and Morgan as they struggle to control Aguirre on the hood of Officer

Mendez's patrol car.  (Id. at 04:42–05:40.)  Once Officers Mendez, Morgan, and

Gonzales moved Aguirre down to the ground, Officer Arredondo – according to

her affidavit – held on to Aguirre's right shoulder "using empty hand control

techniques." (Arredondo Aff. at 3.) When Aguirre was on the ground, Officer Arredondo's affidavit states that Aguirre was "yelling strange things and calling for his mother." (Id.) She also asked Officer Mendez to hold Aguirre's head still to keep Aguirre from scratching his face, since Aguirre was moving his head back and forth on the roadway gravel. (Id.)

Because Officer Mendez's positioning on the left side of Aguirre blocks most of Officer Arredondo, who was on the right side of Aguirre, it is difficult to assess from the dash-cam footage how much force or pressure Officer Arredondo placed on Aguirre. Nonetheless, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." Thompson, 762 F.3d at 436–37. So – absent any evidence from Plaintiffs that creates a genuine fact issue as to Officer Arredondo's specific involvement or objectively unreasonable conduct in restraining Aguirre – the Court finds that **Officer Arredondo is entitled to qualified immunity on the excessive force claim.**

b. Failure to Provide Medical Care Claim

Plaintiffs also allege a Section 1983 claim against the Officers for failure to provide medical care. The complaint alleges that the Officers were deliberately indifferent to the fact that Aguirre was suffocating and merely watched him for several minutes without any regard for his safety and well-being. (Compl. ¶¶ 20–22.) Again, the Officers' MSJ asserts the defense of qualified immunity,

arguing that there is no evidence that any of the Officers knew of and were deliberately indifferent to a serious medical condition of Aguirre, and that in fact, when the officers noticed he was not breathing, they actively took steps to help him.  (Dkt. # 52 at 18.)

       "[P]retrial detainees have a constitutional right, under the Due Process Clause of the Fourteenth Amendment, not to have their serious medical needs met with deliberate indifference on the part of the confining officials." Thompson v. Upshur Cty., 245 F.3d 447, 457 (5th Cir. 2001) (citing Estelle v. Gamble, 429 U.S. 97, 103 (1976)).  Deliberate indifference means that: "(1) the official was aware of facts from which an inference of substantial risk of serious harm could be drawn; (2) the official actually drew that inference; and (3) the official's response indicates the official subjectively intended that harm to occur." Id. at 458–59. "[A]ctual knowledge is critical to the inquiry.  A state actor's failure to alleviate 'a significant risk that he should have perceived but did not' . . . does not rise to the level of deliberate indifference." McClendon v. City of Columbia, 305 F.3d 314, 326 n.8 (5th Cir. 2002) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

       Thus, deliberate indifference "cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm," Upshur Cty., 245 F.3d at 459; it is a "stringent standard of fault." Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 410 (1997).  Moreover, "[a]

serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required."  Gobert v. Caldwell, 463 F.3d 339, 345 n. 12 (5th Cir. 2006).

Because the Court may address the prongs of qualified immunity in any order, Pearson, 555 U.S. at 236, the Court starts with the second prong—that is, whether the Officers acted objectively unreasonably in the context of clearly established law by their alleged failure to provide medical care to Aguirre when he stopped breathing.  See Carroll, 800 F.3d at 169; see also Johnson v. Osborne, 41 F.3d 662, 1994 WL 684640, at *2 (5th Cir. Nov. 16, 1994) (stating that the second prong of qualified immunity in the context of a claim for failure to provide medical care "is whether the denial of medical care was objectively reasonable in light of the Fourteenth Amendment's guarantee of reasonable medical care and prohibition on punishment of pretrial detainees" (internal quotations and citation omitted)).

The Court finds that all five named Officers – Officer Gonzales, Mendez, Morgan, Juarez, and Arredondo – acted objectively reasonably, and are therefore entitled to qualified immunity on the Section 1983 denial of medical care claim.  The Court has come to this conclusion for each officer as follows.  See Meadours, 483 F.3d at 422 (where distinguishable or identifiable, defendants' conduct must be examined individually for qualified immunity (citations omitted)).

i.  Officer Gonzales

Plaintiffs argue that Aguirre was in a handcuffed prone position that is "well known to be conducive to respiratory distress, positional asphyxiation, and apparent sudden death syndrome," and that furthermore, Aguirre was "exhibiting clear signs of Excited Delirium Syndrome which is known to be a medical emergency."  (Dkt. # 70 at 6–7, 13–14.)  Plaintiffs' complaint maintains that, not only were the Officers deliberately indifferent to Aguirre's medical needs when the Officers were allegedly suffocating him, but also that the Officers should have known the dangers of positional asphyxiation and should have been able to recognize the signs of Excited Delirium.  (Compl. ¶¶ 26, 43.)  With respect to Officer Gonzales, Plaintiffs specifically contend that she exacerbated this dangerous position by crossing Aguirre's legs and bending them at the knees and forcing his feet up towards his buttocks, something Plaintiffs call the "functional equivalent of a 'hogtie.'"  (Dkt. # 70 at 14.)

In support, Plaintiffs offer excerpts of the SAPD General Manual, which state, in relevant part, that "[p]risoners will not have their hands and legs secured together in any form or position commonly known as 'hog-tying' (Dkt. # 69-7, Ex. 6 at 2), and that "[p]risoners are not placed in a prone position or any other position which could cause positional asphyxia" (Dkt. # 69-5, Ex. 4 at 1).

Plaintiffs also offer Dr. Mittler's expert report,[8] which opines that the "actions of the SAPD officers at the scene . . . were a direct and proximate cause of [Aguirre's] premature death because of being restrained in the prone position with pressure applied to his back and neck and his legs folded up backwards." (Dkt. # 69-22, Ex. N at 9.) Dr. Mittler also expressed the opinion that "the SAPD officers were grossly negligent in their start of CPR . . . [because] [t]here appears to be a delay of approximately 4 minutes and 30 seconds from the time the SAPD officers turn Mr. Aguirre on his back to when functional CPR is started." (Id. at 10–11.)

Moreover, with respect to Excited Delirium Syndrome ("EDS"), from which the autopsy report indicates Aguirre died (see Dkt. # 52-13, Ex. L-11 through L-15[9]), Dr. Mittler stated that EDS "is a controversial diagnosis . . . that is not recognized by the American Medical Association or the American Psychiatric Association," but that is described as involving "the sudden death of an individual during or following an episode of excited delirium, in which an autopsy fails to reveal evidence of sufficient trauma or natural disease to explain the death." (Id. at

---

[8] Dr. Mittler's expert report and testimony is the subject of Defendants' Motion to Exclude Expert Testimony. (See Dkt. # 51.)

[9] The autopsy's conclusion states that Aguirre "died as a result of excited delirium associated with cocaine and ethanol intoxication," and because of the "restraint by police," the case was classified as a homicide. (Dkt. # 52-13, Ex. L-15.)

12.)  Dr. Mittler states that "I am not agreeing the EDS is a real syndrome, but if it does exist, the SAPD officers involved appear to have violated all the warnings and admonitions to treat it and prevent death."  (Id. at 13.)  Dr. Mittler's deposition testimony largely mirrors his expert report findings, including testifying that "the police knew or should have known that somebody [sic] has blue lips and is exhibiting no movement and has no pulse, that indicates a very, very grievous medical situation which they were deliberately indifferent to."  (See, e.g., Dkt. # 69-8, Ex. 7 at 50 (tr. 194:8–21).)[10]

On the other hand, Officer Gonzales' affidavit states that she crossed Aguirre's legs and pushed them upwards to prevent Aguirre from kicking, and that she was squatting over him and may have had her knees on the back of his legs as she used her arms to hold Aguirre's legs in place.  (Gonzales Aff. at 4.)  The affidavit also states that Officer Gonzales "did not see anyone . . . putting pressure on [Aguirre's] back or his torso which in any way appeared to [her] to be restricting his breathing."  (Id.)  In fact, the affidavit declares that, because Aguirre was talking and asking for his mom, Officer Gonzales inferred that he was able to breath.  (Id.)  Indeed, where there is audio to the dash-cam footage, Aguirre can be heard yelling and making noise prior to becoming quiet.  (Gonzales Dash-Cam at

---

[10] The Court incorporates and applies its analysis of the facts and circumstances surrounding Aguirre's medical needs to each officer's qualified immunity analysis hereafter.  Where relevant, any conduct specifically attributable to an individual officer is addressed separately, as well.

06:27–08:53.)  Moreover, Officer Gonzales states that, when Aguirre became

unresponsive, the officers moved him onto his back and rubbed his sternum to see

if he would respond.  (Gonzales Aff. at 5; id. at 11:40–12:00.)

          Even assessing the summary judgment evidence in the light most

favorable to Plaintiffs and drawing all reasonable inference in their favor, see

McData Servs. Corp., 646 F.3d at 326, the Court finds that Plaintiffs have not

demonstrated a genuine fact issue that Officer Gonzales was deliberately

indifferent to Aguirre's medical needs.  At most, Plaintiffs' summary judgment

evidence, including Dr. Mittler's report, suggests that the Officers perhaps should

have known or been aware that positional asphyxia was a risk from detaining

someone in the prone position.  But this is not enough to meet the "stringent"

standard of deliberate indifference, for such a showing requires facts that support

that the defendants in question had both *actual knowledge* about substantial risks

of serious harm to the individual, and the *subjective intent* to cause that harm to

occur.  See McClendon, 305 F.3d at 326 n.8; Upshur Cty., 245 F.3d at 458–59.

Plaintiffs have not proffered sufficient facts or evidence that the officers on scene

had actual knowledge that Aguirre was suffocating, nor that they subjectively

intended Aguirre to die on Highway 90.  Additionally, where Dr. Mittler

admittedly cannot even determine whether EDS is a "real syndrome," none of the

Officers can be charged with deliberate indifference to a medical condition that may or may not exist.

>   To the contrary, the video footage – which this Court is allowed to assign greater weight in the summary judgment analysis, see Carnaby, 636 F.3d at 183 – shows that, when Aguirre stopped moving and yelling, becoming unresponsive, the officers grew concerned and took off Aguirre's handcuffs, turned him over and sat him up, did a "sternum rub" to get a reaction, and began CPR and emergency resuscitation procedures while waiting for EMS.  (Gonzales Dash-Cam at 11:40–13:51.)  Far from deliberate indifference, the Officers' conduct, including Officer Gonzales – who took turns rotating in to do chest compressions – shows that the Officers had no subjective intent for harm to occur to Aguirre, and that they reacted and responded with life-saving procedures.  Therefore, because even a state actor's "failure to alleviate 'a significant risk that he should have perceived but did not'" is not sufficient to rise to the level of deliberate indifference, McClendon, 305 F.3d at 326 n.8 (quoting Farmer, 511 U.S. at 837), Plaintiffs have not met their burden to raise a genuine dispute of material fact as to the objective reasonableness of the Officers' conduct sufficient to overcome qualified immunity.

>   Accordingly, **Officer Gonzales is entitled to qualified immunity on the failure to provide medical care claim.**

ii.  Officer Mendez

Officer Mendez is entitled to qualified immunity on the denial of
medical care claim for similar reasons.  Plaintiffs characterize that Officer Mendez
"applied pressure to the back of Aguirre's shoulder and held his head face down as
Aguirre was trying to gasp for oxygen."  (Dkt. # 70 at 14.)  However, the Court
need not rely on Plaintiffs' depictions where the record discredits such a
description, but instead, may rely on facts and events as shown in the video footage
available.  See Carnaby, 636 F.3d at 187 (quoting Scott, 550 U.S. at 381).  As
discussed above, the video footage shows Officer Mendez holding Aguirre's head
and shoulders still after several minutes of Aguirre twisting his head left to right
while he was on the ground.  (Gonzales Dash-Cam at 06:30–10:00.)

Officer Mendez's affidavit states that, when he got out of his vehicle
upon arriving at the scene, he "could hear Aguirre talking but [ ] could not make
sense of what he was saying."  (Mendez Aff. at 2.)  After arresting Aguirre and
pulling him over the median, Officer Mendez states that Aguirre was trying to pull
away from Officer Mendez as Officer Mendez was leading him to the hood of the
patrol car.  (Id.)  Because of Aguirre's continued resistance and struggle, and
because of Officer Mendez's ongoing concern for the severity and danger of the
situation, Officer Mendez thought it would be safer to transport Aguirre in a police
wagon, as opposed to the back of the patrol car.  (Id.)

44

In the meantime, Aguirre was taken down to the ground, and –
according to Officer Mendez – when Aguirre became unresponsive after having
been agitated, Officer Mendez "found it odd and immediately rolled [Aguirre] onto
his back . . . and performed a sternum rub;" Aguirre did not react.  (Mendez Aff. at
4.)  According to the video footage, Officer Juarez can be seen jogging and
walking quickly to retrieve his medical equipment from his patrol car.  (Gonzales
Dash-Cam at 12:00–13:10; Greene Dash-Cam at 07:00–08:00.)  Once Officer
Juarez hooked the defibrillator to Aguirre, the officers on the ground surrounding
Aguirre started CPR, including Officer Mendez, who stated that he rotated with
Officers Gonzales and Morgan to do chest compressions.  (Mendez Aff. at 4.)

Although the complaint alleges that "[t]he officers were deliberately
indifferent to the fact that [Aguirre] was suffocating under the weight of the
officers and in serious physical danger of asphyxiation based upon the positional
restraints and body weight and force applied to him" (see, e.g., Compl. ¶ 20),
Plaintiffs have not met their burden of creating a genuine fact issue that Officer
Mendez was deliberately indifferent to Aguirre's medical needs.  To the contrary,
the uncontroverted summary judgment evidence shows that the Officers, including
Officer Mendez, observed Aguirre when he became unresponsive, noted that this
was a different state than his previous demeanor, and took steps to change
Aguirre's positioning to do a "sternum rub" and start CPR.

Plaintiffs have neither shown that Officer Mendez was aware of facts from which he could infer that a "substantial risk of serious harm" existed, nor have they shown that Officer Mendez actually drew that inference, nor have they shown that Officer Mendez subjectively intended any suffocation to occur. See Upshur Cty., 245 F.3d at 457–59. And as indicated above, even if Officer Mendez *should have known* that lying Aguirre on his stomach presented a substantial risk of serious harm, this is not sufficient to rise to the level of deliberate indifference. See Upshur Cty., 245 F.3d at 459 (stating that deliberate indifference cannot be inferred from negligent, or even grossly negligent, conduct). Accordingly, because Plaintiffs have not rebutted the qualified immunity defense, **Officer Mendez is entitled to qualified immunity on the failure to provide medical care claim.**

### iii.  Officer Morgan

Officer Morgan is also entitled to qualified immunity on the denial of medical care claim. The complaint does not indicate how Officer Morgan, herself specifically, was deliberately indifferent to Aguirre's medical needs, other than to group her conduct collectively with the other officers. (See Compl. ¶¶ 19–22.) In the same vein, Plaintiffs' response to the Officers' MSJ does not address or identify any conduct specifically attributable to Officer Morgan. (See Dkt. # 70.)

As discussed above and as can be seen on the dash-cam footage, Officer Morgan participated in conducting chest compressions on Aguirre while

46

the Officers were waiting for EMS to arrive.  (Mendez Aff. at 4; Morgan Aff. at 5;

Gonzales Dash-Cam at 18:45–20:00.)  From Officer Morgan's affidavit, she

describes that the scene was very hectic and active and that she was concerned for

everyone's safety because a vehicle accident had just occurred on the right side of

the highway, as well.  (Morgan Aff. at 4–5.)  Officer Morgan indicated that, at no

point prior to Aguirre becoming unresponsive, did she believe Aguirre was having

trouble breathing or was in any kind of medical distress.  (Id. at 5.)  That there

were other officers on scene who may have been laughing (or joking) – they can be

seen in the video, *inter alia*, watching Aguirre and the officers tending to him and

managing the flow of traffic[11] (Dkt. # 70 at 15) – is legally irrelevant to assessing

whether the named Officers, and in this case Officer Morgan, was or was not

deliberately indifferent to Aguirre's medical needs.

      Plaintiffs point to no further evidence, besides the evidence already

disposed of above, that demonstrates a genuine fact issue exists regarding whether

or not Officer Morgan was deliberately indifferent to Aguirre's medical needs once

he became unresponsive.  Thus, since deliberate indifference is a "stringent"

standard and cannot be inferred from "merely negligent or even grossly negligent

conduct," see Upshur Cty., 245 F.3d at 459, and Plaintiffs have not otherwise

sufficiently rebutted the defense of qualified immunity, **Officer Morgan is**

---

[11] The Court finds that, while the minimal joking that took place was unfortunate, it
did not impact the events which occurred and gave rise to the instant complaint.

**entitled to qualified immunity on the claim for failure to provide proper medical care.**

iv.  <u>Officer Juarez</u>

Officer Juarez is also entitled to qualified immunity on Plaintiffs' Section 1983 denial of medical care claim because Plaintiffs have not met their burden of overcoming qualified immunity by demonstrating genuine fact issues regarding the reasonableness of Officer Juarez's conduct.  <u>See</u> <u>Brown</u>, 623 F.3d at 253; <u>Bazan</u>, 246 F.3d at 490.  The Court finds that it was not unreasonable for Officer Juarez, upon his arrival to the scene, to stay standing and not participate in the restraint of Aguirre, since there were at least four other officers assisting to restrain Aguirre on the ground.  (Gonzales Dash-Cam at 07:30–08:09.)  Furthermore, although Plaintiffs contend that Officer Juarez "sauntered over to his vehicle to retrieve his medical equipment" once he confirmed Aguirre was not breathing, the video footage shows otherwise.  (<u>See</u> Dkt. # 69-1, App'x at 17–18.)  The dash-cam shows that Officer Juarez jogged to his vehicle, which was parked two cars away from Aguirre, opened the trunk, grabbed the equipment bags, and started jogging and walking back quickly.  (Gonzales Dash-Cam at 12:00–13:10; Greene Dash-Cam at 07:00–08:00.)  Officer Juarez's affidavit states that he walked back from his patrol car for part of the way to "slow [his] breathing and thinking in

48

order to calm [himself] to better focus [his] concentration on treating Mr. Aguirre."
(Juarez Aff. at 2.)

Even if, as the Plaintiffs maintain, Officer Juarez slowed down or
walked and had a smile on his face and a jovial demeanor, (see Dkt. # 69-1 at 18),
these expressions are not sufficient – without any other controverting evidence – to
meet the high standard required for a showing of deliberate indifference to
Aguirre's medical needs when the Officers realized Aguirre had stopped breathing
and being responsive.  Therefore, because Plaintiffs have not offered sufficient
evidence to demonstrate a genuine fact issue as to the objective reasonableness of
Officer Juarez's conduct, they have not rebutted the qualified immunity defense.
See Brown, 623 F.3d at 253; Bazan, 246 F.3d at 490.  Accordingly, **Officer
Juarez is entitled to qualified immunity on the failure to provide medical care
claim.**

v.  Officer Arredondo

Finally, for similar reasons already discussed, Officer Arredondo is
also entitled to qualified immunity on the failure to provide medical care claim.
Plaintiffs specifically contend that, while Aguirre was on the ground, Officer
Arredondo kneeled next to his head and was trying to hear what he was saying; she
concluded he was speaking "gibberish."  (Dkt. # 70 at 14.)  According to Plaintiffs,

Officer Arredondo also noticed Aguirre's lips had turned blue and "incredibly" did not communicate this to her fellow officers.  (Id.)

Per Officer Arredondo's affidavit, she recalls holding on to Aguirre's right shoulder "using only empty hand control techniques," and that Aguirre was "yelling strange things and calling for his mother" while he moved his head back and forth "on the roadway scratching his face."  (Arredondo Aff. at 3.)  She asked Aguirre "what was going on because [she] believed he may have been on drugs and [she] wanted to know what kinds of drugs he was on."  (Id.)  Her affidavit concededly states that she noticed Aguirre's lips were blue, but that she was "not concerned because [she has] seen people on drugs with blue skin color."  (Id.)  Aguirre did not appear to her to be having trouble breathing because he continued to talk and yell at the officers, "and for him to do that he had to be breathing."  (Id.)

Assessing the evidence in the light most favorable to Plaintiffs, even if Officer Arredondo should have alerted someone or been aware that blue lips were an indicator of a serious medical emergency, this alone is not sufficient to rise to the level of deliberate indifference, which requires that "(1) the official was aware of facts from which an inference of substantial risk of serious harm could be drawn; (2) the official actually drew that inference;" and critically to this Court's conclusion, "(3) the official's response indicates the official *subjectively intended*

*that harm to occur*."  See Upshur Cty., 245 F.3d at 458–59 (emphasis added).

Under the totality of the circumstances, it was reasonable for Officer Arredondo –

and the other officers – to infer from Aguirre's yelling and movement that there

was not a substantial risk of serious harm resulting from Aguirre's positioning on

the asphalt.  Furthermore, it was reasonable for Officer Arredondo to infer that,

although Aguirre's lips were blue, there was not – at that time – a substantial risk

of serious harm to Aguirre.

When Aguirre became unresponsive, Officer Arredondo "told

everyone that he was not moving so [they] turned him over" and she assisted in

taking Aguirre's handcuffs off.  The dash-cam footage, as well as the affidavit,

shows that Officer Arredondo removed herself from the situation when the tactical

medic took off Aguirre's shirt and began chest compressions, and went to focus on

traffic.  In light of the other officers doing chest compressions, a situation where it

would likely be inefficient to have too many people helping – and absent

controverting summary judgment evidence – the Court finds that Plaintiffs have

not shown Officer Arredondo was deliberately indifferent to Aguirre's medical

needs, nor have they created a genuine fact issue as to the reasonableness of her

conduct.  Accordingly, because they have not met their burden of rebutting

qualified immunity, **Officer Arredondo is entitled to qualified immunity on the**

**failure to provide medical care claim.**

c.  Excessive Punishment and Execution Claim

Plaintiffs' final Section 1983 claim against the Officers is a claim of excessive punishment and execution, in violation of Aguirre's Eighth Amendment rights.  (Compl. ¶ 49.)  The Officers' MSJ argues that Plaintiffs' cause of action fails as a matter of law because the Eighth Amendment protects only convicted prisoners.  (Dkt. # 52 at 18.)  The City's MSJ asserts the same.  (Dkt. # 54 at 20–21.)  Defendants are correct.

Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment, not by the Eighth Amendment's prohibition against cruel and unusual punishment.  Johnson, 1994 WL 684640, at *2 (citing Morrow v. Harwell, 768 F.2d 619, 625–26 (5th Cir. 1985)); Morin v. Caire, 77 F.3d 116, 120 (5th Cir. 1996) ("The protections of the Eighth Amendment against cruel and unusual punishment are limited in scope to convicted prisoners and do not apply to pretrial detainees[.]" (citing, inter alia, Ingraham v. Wright, 430 U.S. 651, 671 n.40 (1977))).  Because Aguirre was not a convicted prisoner at the time of the incidents, he was not entitled to Eighth Amendment protections.  Therefore, the Court **grants summary judgment in favor of the Officers and the City on Plaintiffs' Section 1983 claim for excessive punishment and execution.**

C. <u>State Law Negligence Claim Regarding Handcuffs Under the TTCA</u>

Plaintiffs also bring a state law negligence claim against the Officers' under the Texas Tort Claims Act ("TTCA") for negligent use of handcuffs. (Compl. ¶¶ 26, 56.)  The Officers move for summary judgment on this claim, arguing that the claim is legally barred by the TTCA's Election of Remedies provision, which states in pertinent part that:

> If a suit is filed against an employee of a governmental unit based on conduct within the general scope of that employee's employment and if it could have been brought under this chapter against the governmental unit, the suit is considered to be against the employee in the employee's official capacity only.  On the employee's motion, the suit against the employee shall be dismissed unless the plaintiff files amended pleadings dismissing the employee and naming the governmental unit as defendant on or before the 30th day after the date the motion is filed.

Tex. Civ. Prac. & Rem. Code § 101.106(f) ("Section 101.106(f)").  The Officers contend that Plaintiffs have conceded that the Officers were acting within the general scope of their employment with the City at the time of the incident, and furthermore, that Texas state law has determined that even claims based on intentional torts are subject to the provisions of Section 101.106(f).  (Dkt. # 52 at 19–20.)  Plaintiffs' response to the Officers' MSJ does not address this claim or argument.

The Court finds that the Election of Remedies provision of the TTCA bars Plaintiffs' state law negligence claim against the Officers.  In interpreting this provision, the Texas Supreme Court in <u>Franka v. Velasquez</u> held that any state law tort claim brought against a government employee in his individual capacity based on actions within the general scope of his or her employment must be dismissed. 332 S.W.3d 367, 381–85 (Tex. 2011).  District courts generally abide by this construction of the statute.  <u>See, e.g.</u>, <u>Perez v. Texas A&M Univ. at Corpus Christi</u>, Civ. A. No. 2:13-CV-225, 2013 WL 6230353, at *12 (S.D. Tex. Dec. 2, 2013) (finding that, under Section 101.106(f), tort "claims against the individual defendants—in both their individual and official capacities and for both money and injunctive relief—must be dismissed" (internal citations omitted)).

Here, the Officers are undisputedly employees of the City, and were concededly "acting within the course and scope of their employment or official duties and in furtherance of the duties of their office or employment" with the SAPD.  <u>See</u> Compl. ¶¶ 25, 46; <u>see also</u> <u>Ikossi-Anastasiou v. Bd. of Supervisors of La. State Univ.</u>, 579 F.3d 546, 550 (5th Cir. 2009) ("Factual assertions in the complaint are 'judicial admissions conclusively binding' on the plaintiff." (quoting <u>Morales v. Dep't of Army</u>, 947 F.2d 766, 769 (5th Cir. 1991))).  Where Plaintiffs' complaint alleges the Officers utilized handcuffs negligently during Aguirre's arrest and apprehension, this is a tort claim that falls squarely within the TTCA.

See Bernard v. City of Hous., Civil Action No. H-15-734, 2017 WL 1088348, at *9 (S.D. Tex. Mar. 2, 2017) ("[S]ection 101.106(f) of the TTCA applies to all common-law tort theories" (citing Franka, 332 S.W.3d at 369)).  Therefore, per the plain meaning of the TTCA, the claim must be dismissed upon the employees' – here, the Officers' – motion.  Accordingly, the Court **grants summary judgment in favor of the Officers on Plaintiffs' state law negligence claim under the TTCA.**

   II.   The City's Motion for Summary Judgment

        The City moves for summary judgment on Plaintiffs' claims of (1) failure to properly train, brought under both Section 1983 and the TTCA, and (2) negligent use of handcuffs under the TTCA.[12]  (Dkt. # 54 at 1, 5–20.)  The City also moves for summary judgment on the basis that it is not liable for the Officers' alleged violations of Aguirre's constitutional rights under a theory of respondeat superior.  (Id. at 4.)

        A.   Failure to Properly Train Claim Under Section 1983 and the TTCA

        Liberally construed, Plaintiffs' complaint alleges that the City's "failure to properly train, supervise, regulate, and/or discipline officers who routinely use excessive force in making arrests . . . or to otherwise control their

_____

[12] The City also moved for summary judgment on Plaintiffs' Section 1983 claim for excessive punishment and execution under the Eighth Amendment (Dkt. # 54 at 20–21), but the Court has already disposed of this claim both against the Officers and the City.  (See supra Discussion I.B.1.c.)

employees and the failure to promulgate proper guidelines for the use of force and deadly force constitutes an official policy, practice, or custom of condoning unjustified use of deadly force" in violation of the Constitution.  (Compl. ¶¶ 44, 51.)  In the same vein, Plaintiffs maintain that, because the "continuum of force policy used by the [SAPD] was flawed in that it authorized officers to use handcuffs and other positional restraints in combination with weight and force on [Aguirre's] back while being held in a prone a prone position," the SAPD's guidelines were "grossly inadequate and lead to the Defendants' unrestrained use of excessive force."  (Id. ¶ 42.)  Moreover, Plaintiffs assert a lack of proper or adequate training on how to recognize the signs of positional asphyxiation and excited delirium.  (Id. ¶¶ 26(c), 26(d), 43.)

Because of the Complaint's lack of clarity, the Court – out of an abundance of caution – assumes Plaintiffs bring the failure to properly train claim under Section 1983 and the TTCA.

      1.  <u>Municipal Liability Under Section 1983 for Failure to Properly Train or Lack of Adequate Training</u>

To establish municipal liability under Section 1983, a plaintiff must prove three elements: (1) a policymaker; (2) an official policy; and (3) a violation of constitutional rights whose 'moving force' is the policy or custom.  <u>Piotrowski v. City of Hous.</u>, 237 F.3d 567, 578 (5th Cir. 2001) (citing <u>Monell v. Dep't of Soc.</u>

Servs. of City of N.Y., 436 U.S. 658, 694 (1978)); see also Thompson, 762 F.3d at

441–42 ("To state a claim against a municipality under 42 U.S.C. § 1983, a

plaintiff must allege that there was either an official policy or an unofficial custom,

adopted by the municipality, that was the moving force behind the claimed

constitutional violation." (internal quotations and citation omitted)).  "[A]lthough

the touchstone of the § 1983 action against a government body is an allegation that

*official policy* is responsible for a deprivation of rights protected by the

Constitution, local governments . . . may be sued for constitutional deprivations

visited pursuant to *governmental 'custom'* even though such a custom has not

received formal approval through the body's official decisionmaking channels."

Monell, 436 U.S. at 690–91 (emphasis added).

　　　　　In the context of attempting to impose municipal liability for failure to

properly train police officers, the Supreme Court has held that plaintiffs must first

prove a direct causal link between the municipal policy and the constitutional

deprivation.  City of Canton v. Harris, 489 U.S. 378, 385–86 (1989).  Then,

plaintiffs must establish that the city consciously enacted a policy reflecting

"deliberate indifference" to the constitutional rights of its citizens.  City of Canton,

489 U.S. at 388–89.  "Only where a failure to train reflects a 'deliberate' or

'conscious' choice by a municipality—a 'policy' as defined by our prior cases—

can a city be liable for such a failure under § 1983."  Id. at 389.

The Supreme Court has noted that, "[i]n resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform."  Id. at 390.  "Proof of more than a single instance of the lack of training or supervision causing a violation of constitutional rights is normally required before such lack of training or supervision constitutes deliberate indifference."  Upshur Cty., 245 F.3d at 459 (citing Snyder v. Trepagnier, 142 F.3d 791, 798–99 (5th Cir. 1998)).  At the least, a plaintiff must show a pattern of similar violations.  Id.  Additionally, the "inadequacy of training must be obvious and obviously likely to result in a constitutional violation."  Id.; see also Piotrowski, 237 F.3d at 579 ("While an unconstitutional official policy renders a municipality culpable under § 1983, even a facially innocuous policy will support liability if it was promulgated with deliberate indifference to the 'known or obvious consequences' that constitutional violations would result." (quoting Bryan Cty., 520 U.S. at 407)).  This kind of deliberate indifference is a "stringent" standard, and "a showing of simple or even heightened negligence will not suffice" to prove municipal culpability.  Piotrowski, 237 F.3d at 579.  Therefore, "each and any policy which allegedly caused constitutional violations must be specifically identified by a plaintiff."  Id.

The Fifth Circuit has explained that the Supreme Court's line of Monell decisions "underscores the need for Monell plaintiffs to establish both the

causal link ("moving force") and the City's degree of culpability ("deliberate

indifference" to federally protected rights)."  Snyder, 142 F.3d at 796 (citing Bryan

Cty., 520 U.S. at 410).  For that reason, the Fifth Circuit has "demanded a high

standard of proof before imposing Monell liability on a municipality."  Id.

(applying Bryan County's "rigorous requirements of culpability and causation"

(internal quotations and citation omitted)).

   The Court finds that neither Plaintiffs' complaint nor Plaintiffs'

response to Defendants' summary judgment motions raise genuine issues of

material fact as to whether the City adequately trains its police officers on the use

of force and on ways to recognize excited delirium and positional asphyxia.

Besides the general, conclusory, and "unsubstantiated assertions" made in the

complaint, see Renda Marine, Inc., 667 F.3d at 655, Plaintiffs point to no specific

evidence that establishes genuine fact issues as to whether, *inter alia*: (1) the City

has either an official policy or unofficial custom of condoning, accepting, or

allowing excessive force; (2) there is or was a direct causal link between such a

policy and the alleged violation of Aguirre's constitutional rights; (3) any such

policy reflects deliberate indifference to federally protected rights; and (4) the City

provides inadequate training as to recognizing signs of positional asphyxiation

and/or excited delirium.  See Distribuidora Mari Jose, 738 F.3d at 706 (noting that

the nonmoving party must come forward with specific facts that establish genuine issues of material fact).

Plaintiffs' complaint, in general terms, alleges in various circular iterations that (1) the Officers should have been trained in the dangers of excited delirium and positional asphyxiation, (2) the City's guidelines and continuum for the use of force policy was flawed because it allowed the Officers' to use unrestrained excessive force against Aguirre, (3) the City's failure to properly train or discipline officers who use excessive force and failure to promulgate proper guidelines on such force is an official policy or custom that condones unjustified use of deadly force, and (4) the City's "deliberate approval" of the SAPD's policies or practices has "directly deprived" Aguirre of his right to life without due process.  (Compl. ¶¶ 26, 42, 44, 51.)  However, Plaintiffs' response to Defendants' summary judgment motions fails to substantively address or expand upon these claims in any way, let alone point to specific evidence that creates fact issues as to these contentions.  In fact, Plaintiffs' response only addresses the failure to properly train claim in a cursory fashion, clarifying that "[p]laintiffs have not asserted 'negligent' training claims against the City of San Antonio . . . [t]he failure to train claims are constitutional claims asserted pursuant to 42 U.S.C. § 1983."  (Dkt. # 70 at 16.)

In support, the only evidence Plaintiffs point to or rely on to show the City's inadequate training is the following sentence: "Please note that from 2005 to 2015 there were *123 in-custudy deaths at the hands of San Antonio Police Department Officers.* This startling finding is reported by the Texas Justice Initiative which is based upon the Texas Attorney General's database of custodial death reports." (Id. (emphasis in original).)  Though Plaintiffs utilize this statistic to attempt to show that Aguirre's death "is not a novel or isolated occurrence," the statistic is not supported by a source citation or any other summary judgment evidence.  Even drawing all reasonable inferences in favor of Plaintiffs, as the Court must, see Ehringer Enters., 646 F.3d at 326, this broad, uncited statement alone is not sufficient to create a genuine issue of material fact that the City condones excessive force, is deliberately indifferent to federal rights, and/or fails to properly train its officers in the use of force or medical situations, such as excited delirium and positional asphyxiation.

By contrast, the City – as the moving party – has satisfied its burden of demonstrating the absence of genuine fact issues on the failure to properly train claim.  See Celotex Corp., 477 U.S. at 323.  First, the City points to the affidavit of former SAPD Captain Gustavo Guzman, who – at the time he prepared the affidavit – was the Commander of SAPD Professional Standards Division, and as such, he is familiar with the SAPD's policies and procedures contained in the

General Manual.  (Dkt. # 54 at 8–9; <u>see</u> "Guzman Aff.," Dkt. # 52-17, Ex. P.)

Captain Guzman testifies, *inter alia*, that all officers are educated on the policies

and procedures contained in the General Manual, including Procedure 501 "Use of

Force," Procedure 502 "Warrantless Arrests, Search & Seizure," and Procedure

601 "Prisoners," during their seven-month initial training and continuing yearly in-

service education requirements.[13]  (Guzman Aff. at 3.)  Rather than condone or

permit the use of excessive force, Captain Guzman testifies that Procedure 501

provides in part that "officers shall use only the level of force that is necessary to

accomplish a lawful police objective [and] any time force is used, the officer shall

apply a level of force that is reasonable for the situation."  (<u>Id.</u>)  Captain Guzman

explains that Procedure 501 provides a continuum of force policy, which begins at

the lowest level with the officer's presence and verbal communications and

extends up to intermediate weapon and deadly force, "according to and

proportional with the circumstances of the situation."  (<u>Id.</u> at 3–4.)

Further, according to the deposition testimony of SAPD Officer Dezi

Rios, the main allowable reason to keep someone detained in a prone position is to

---

[13] <u>See also</u> Dkt. # 52-10, Ex. I at 6, 11, "Expert Report of Albert Ortiz" (retired
SAPD Chief of Police who opined, *inter alia*, that (1) the General Manual and
training curriculum is taught to every SAPD officer during their six-month training
at the SAPD Academy and through additional 40 hours of required in-service
training every two years, and (2) SAPD officers employ a version of escalating
force, the Use of Force Continuum, that does not condone or permit excessive
force, but rather teaches levels of force to use reasonably and proportionally to the
situation at hand).

get somebody under control, and the level of control an officer feels he or she has over a detainee may be entirely "situational" and different compared to the next officer.  ("Rios Dep.," Dkt. # 52-16, Ex. O at 27:2–16.)  Officer Rios testified that SAPD officers are taught not to hog-tie persons they have detained, and upon reviewing the dash-cam footage, testified that Aguirre's position was not the equivalent of a "hog tie" because a hog tie is when both legs and both hands/arms are all tied together.  (Id. at 26:4–5; 27:24–25; 28:1; 29:15–20.)  Officer Rios also testified that he teaches a course on positional asphyxia in the SAPD, and he uses teaching materials that instruct officers to be aware of putting detainees in positions that prevent them for breathing, such that "the only time" the prone position should be used is when officers are trying to get or maintain control.  (Id. 25:15–25; 26:15–16.)

Defendants also point to the deposition testimony and affidavit of Officer Sabo, a designated mental health officer in the SAPD and a member of the Crisis Intervention Team who teaches Crisis Intervention ("CIT") classes.  (Dkt. # 54 at 10; see also "Sabo Dep.," Dkt. # 52-14, Ex. M; "Sabo Aff.," Dkt. # 52-15, Ex. N.)  Per Officer Sabo, all officers in the SAPD must attend crisis intervention training, a 40 hour block of instruction that the SAPD has been teaching and mandating since 2010.  (Sabo Dep. 14:12–24; Sabo Aff. at 1–2.)  As part of the CIT training, mental health officers such as Officer Sabo provide training

regarding Excited Delirium Syndrome, how to recognize the symptoms, and what actions to take when facing individuals experiencing excited delirium. (Sabo Aff. at 2, 3–11 (lesson plan), 12–43 (powerpoint slides).) A portion of the lesson plan on Excited Delirium Syndrome provides that: "*Unless there is an immediate public safety threat*, the first responding officers should focus on containing the subject in an environment that offers him maximum possible safety and protects others as well. *Unless there are compelling reasons to do otherwise*, officers should not approach the individual until substantial backup and medical personnel are on the scene." (Id. at 9 (emphasis added).)

Officer Sabo also testified that although verbal de-escalation techniques are taught, they often do not work with individuals experiencing excited delirium, and that therefore, officers may use physical restraint ranging from simply hands-on to handcuffing a person. (Sabo Dep. at 30:2–9, 18–23.) Where the individual Officers' affidavits indicate that they were concerned about the grave potential for an accident on an active, fast-moving freeway, especially since Aguirre was resisting, and that at most they perceived Aguirre might be "on drugs," the Court finds – without further controverting summary judgment evidence – that there are no genuine issues of material fact as to whether the City trains its officers on the proportional use of reasonable force and on the methods for recognizing signs of excited delirium and the dangers of positional asphyxia.

The City's summary judgment evidence, uncontroverted, indicates that the City has training regarding procedures for the use of force and recognizing excited delirium and the dangers of positional asphyxia, and that moreover, the City is not "deliberately indifferent" to an individual's federally protected rights.  See City of Canton, 489 U.S. at 385–89.  And in any event, proof of more than a single instance of inadequate training is normally required because such inadequacy can constitute deliberate indifference to impose municipal liability, which is a "stringent" standard and which has not been challenged by the summary judgment evidence.  See Upshur Cty., 245 F.3d at 459; Piotrowski, 237 F.3d at 579.

Accordingly, Plaintiffs have not provided sufficient evidence to create genuine issues of material fact that the "rigorous requirements of culpability and causation" exist to impose municipal liability on the City for its alleged failure to properly or inadequately train its police officers.  See Snyder, 142 F.3d at 796 (citing Bryan Cty., 520 U.S. at 410).  Because Plaintiffs have not alleged or presented controverting and specific summary judgment evidence showing the existence of a specific municipal policy or custom (be it official or unofficial) which is causally connected to the allegedly unlawful use of force and failure to provide medical care, the Court **grants summary judgment in favor of the City on Plaintiffs' Monell claim.**

2.  Negligent Training and Negligent Use of Handcuffs Under the
    TTCA

The City also argues that it is entitled to summary judgment on

Plaintiffs' state law negligent training claim because such a claim does not fall

within the limited waiver of sovereign immunity under the TTCA.  (Dkt. # 54 at 6–

7.)  In response, Plaintiffs state that they have "not asserted 'negligent' training

claims against the City of San Antonio."  (Dkt. # 70 at 16.)  Rather, Plaintiffs

explain that the use of "the officer's handcuffs on Jesse Aguirre was tangible

personal property of the City that was misused and that this negligent misuse

proximately caused Jesse Aguirre's death."  (Id.)  Plaintiff maintains that the

failure to properly train claims are constitutional claims simply brought under

Section 1983.  (Id.)  To the extent the failure to properly train claims were only

asserted under Section 1983, the Court finds it has already disposed of them above.

However, because of the lack of clarity and organization in the

Complaint, the Court will address this line of arguments arising out of the City's

possibly liability under the TTCA out of an abundance of caution.  Although

Plaintiffs maintain they are not bringing a state law "negligent training" claim,

their allegation that the Officers' negligent use of handcuffs, an instrumentality of

the City, proximately caused Aguirre's death seems to imply that Plaintiffs

somehow would like to hold the City liable for the negligent use of handcuffs by

66

the specifically named defendant officers.  To the extent that this is, in fact, their

claim, (1) it is more properly characterized as simply a state law claim for the

negligent use of handcuffs brought against the City, and (2) the City is entitled to

summary judgment on this specific claim for two reasons.

        First, the City is correct that negligent training, or by extension, the

negligent use of handcuffs, does not fall within the limited category of claims that

are exempted from sovereign immunity waiver under the TTCA.  Dkt. # 54 at 5–7;

see Saenz v. City of El Paso, 637 F. App'x 828, 830 (5th Cir. 2016) (stating that,

under Section 101.021(2), the TTCA "creates a limited waiver of sovereign

immunity 'for certain negligent conduct, but it does not waive immunity for claims

arising out of intentional torts'" (quoting City of Watauga v. Gordon, 434 S.W.3d

586, 594 (Tex. 2014))).  In support, the City argues that – because the Texas

Supreme Court has held in Texas Dep't of Pub. Safety v. Petta, 44 S.W.3d 575

(Tex. 2001) that intentional conduct, no matter how it is plead, falls under the

TTCA's sovereign immunity waiver exception – it follows that Plaintiffs should

not be allowed to "avoid the intentional tort exception to waiver of liability by

simply pleading negligence when the event upon which they base their allegations

is based on intentional conduct" through the use of handcuffs.  (Dkt. # 54 at 6.)

        Section 101.021(2) of the TTCA provides that "a governmental unit in

the state is liable for: . . . personal injury or death so caused by a condition or use

of tangible personal or real property if the governmental unit would, were it a

private person, be liable to the claimant according to Texas law."  Tex. Civ. Prac.

& Rem. Code § 101.021(2) ("Section 101.021").  Although a governmental unit

may waive sovereign immunity under Section 101.021, certain conduct is

exempted from that possible waiver of immunity, including "assault, battery, false

imprisonment, or any other intentional tort."  Id. § 101.057(2); Johnson v. Waters,

317 F. Supp. 2d 726, 739 (E.D. Tex. 2004).  Therefore, when a plaintiff pleads

facts that amount to an intentional tort – even if the claim is framed as arising

under negligence – it is considered a claim for an intentional tort and barred by the

TTCA.  See, e.g., Petta, 44 S.W.3d at 580; Huong v. City of Port Arthur, 961 F.

Supp. 1003, 1008–09 (E.D. Tex. 1997) (finding that, "regardless of the language

used," plaintiffs' attempt to bring "negligence" claims "consist of intentional torts"

and citing Little v. Schafer, 319 F. Supp. 190, 192 (S.D. Tex. 1970) for the

proposition that "where the essence of a claim under the [TTCA] arises from

intentional torts, allegations of negligence are insufficient to avoid the section

101.057 exception to liability").  Moreover, several Texas appellate courts have

specifically held that the use of handcuffs by officers is "clearly intentional"

conduct and thus fits "squarely within section 101.057's exclusion of claims

arising out of assault, battery, or any other intentional tort."  See, e.g., City of

Garland v. Rivera, 146 S.W.3d 334, 338 (Tex. App. 2004) (citing City of Laredo v. Nuno, 94 S.W.3d 786, 788–89 (Tex. App. 2002) and Petta, 44 S.W.3d at 580).

Given the extensive case law on a party's inability to circumvent the TTCA's sovereign immunity waiver exemption by pleading claims based on intentional conduct as arising under "negligence," and also given the sparsity of the Complaint, the Court finds that the use of handcuffs by the Officers in the present case was intentional conduct. See Petta, 44 S.W.3d at 580; Huong, 961 F. Supp. at 1008–09. Accordingly, under the TTCA, the City is entitled to sovereign immunity on this claim arising out of an intentional tort, as opposed to negligence. See Tex. Civ. Prac. & Rem. Code § 101.057(2); Waters, 317 F. Supp. 2d at 739.

Second, even if the City was not protected by the sovereign immunity waiver exception for intentional torts, the Fifth Circuit has held that "[t]he TTCA is . . . not the appropriate vehicle for claims of negligent failure to train or supervise." Goodman v. Harris Cty., 571 F.3d 388, 394 (5th Cir. 2009). "Such claims are not within the purview of the TTCA because 'a plaintiff must allege an injury resulting from the condition or use of tangible personal or real property' and 'information is not tangible personal property, since it is an abstract concept that lacks corporeal, physical, or palpable qualitites [sic].'" Id. (quoting Petta, 44 S.W.3d at 580). Therefore, because failure to train or supervise is not a proper cause of action under the TTCA, Petta, 44 S.W.3d at 580–81, **the City is entitled**

**to summary judgment on Plaintiffs' state law claims of negligent training, or by extension, negligent use of handcuffs.**

    III.   <u>Defendants' Motion to Exclude Expert Testimony of Dr. Mittler</u>

                In light of the Court's decisions regarding Defendants' summary judgment motions (Dkts. ## 52, 54), the Court **denies as moot** Defendants' Motion to Exclude Expert Testimony (Dkt. # 51) since it has found that – even considering the challenged expert report and deposition testimony of Dr. Mittler – Plaintiffs have failed to create genuine fact issues as to their Section 1983 and state law claims.

CONCLUSION

                For the reasons set forth, the Court: (1) **GRANTS** the Officers' Motion for Summary Judgment (Dkt. # 52); (2) **GRANTS** the City of San Antonio's Motion for Summary Judgment (Dkt. # 54); and (3) **DENIES AS MOOT** Defendants' Motion to Exclude Expert Testimony (Dkt. # 51).  Further, in light of this Order, the Court **DENIES AS MOOT** Defendants' Motion to Strike Plaintiffs' Advisory to the Court (Dkt. # 76).

                The Court **ORDERS** the above-captioned case **DISMISSED WITH PREJUDICE.**  The Clerk's Office is instructed to **ENTER JUDGMENT AND**

**CLOSE THE CASE.**

      **IT IS SO ORDERED.**

      **DATED:** San Antonio, Texas, May 19, 2017.

                                _____

                                  DAVID ALAN EZRA
                                  UNITED STATES DISTRICT JUDGE