# United States Court of Appeals
# for the Fifth Circuit

FILED

MAY 14 2021

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

No. 17-51031

ESTATE OF JESSE AGUIRRE, DECEASED; BLANCA AGUIRRE,
INDIVIDUALLY AND AS NEXT FRIEND OF JESSE AGUIRRE, JR.,

*Plaintiffs—Appellants*,

*versus*

CITY OF SAN ANTONIO; OFFICER CRISTINA GONZALES;
OFFICER ROBERTO MENDEZ; OFFICER JENNIFER MORGAN;
OFFICER BETTINA ARREDONDO; OFFICER BENITO JUAREZ,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:15-CV-371 -DAE

Before JOLLY, DENNIS, and HIGGINSON, *Circuit Judges*[*].

JUDGMENT

This cause was considered on the record on appeal and was argued by
counsel.

---

[*] CIRCUIT JUDGE JOLLY joins this opinion except as to Parts I & II. CIRCUIT
JUDGE HIGGINSON joins this opinion except as to § II.B.

No. 17-51031

IT IS ORDERED and ADJUDGED that the judgment of the District Court is AFFIRMED IN PART and VACATED IN PART, and the cause is REMANDED to the District Court for further proceedings in accordance with the opinion of this Court.

IT IS FURTHER ORDERED that each party bear its own costs on appeal.

E. Grady Jolly and Stephen A. Higginson, *Circuit Judges*, concurring in the judgment.

**A True Copy**
**Certified order issued May 14, 2021**

*Lyle W. Cayce*
**Clerk, U.S. Court of Appeals, Fifth Circuit**

FILED

MAY 1 4 2021

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 22, 2021

Lyle W. Cayce
Clerk

———

No. 17-51031

———

ESTATE OF JESSE AGUIRRE, DECEASED; BLANCA AGUIRRE,
INDIVIDUALLY AND AS NEXT FRIEND OF JESSE AGUIRRE, JR.,

*Plaintiffs—Appellants,*

*versus*

CITY OF SAN ANTONIO; OFFICER CRISTINA GONZALES;
OFFICER ROBERTO MENDEZ; OFFICER JENNIFER MORGAN;
OFFICER BETTINA ARREDONDO; OFFICER BENITO JUAREZ,

*Defendants—Appellees.*

———————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:15-CV-371-DAE

———————————

Before JOLLY, DENNIS, and HIGGINSON, *Circuit Judges.*

JAMES L. DENNIS, *Circuit Judge*[*]:

The family of Jesse Aguirre (the Plaintiffs) filed this 42 U.S.C. § 1983
lawsuit alleging that officers of the San Antonio Police Department violated
Aguirre's constitutional rights by causing his death through the use of

———————————

[*] CIRCUIT JUDGE JOLLY joins this opinion except as to Parts I & II. CIRCUIT
JUDGE HIGGINSON joins this opinion except as to § II.B.

17-51031

excessive force—specifically, by contorting and holding his body in a prone, hog-tie-like, "maximal-restraint position" during his arrest, leading to his dying from asphyxiation. Aguirre's family claimed that five of the officers killed Aguirre by holding him face down on pavement with his hands cuffed behind his back and his legs restrained, bent at the knees, and crossed against his buttocks, for approximately five-and-a-half minutes, during which time Aguirre stopped breathing. They further asserted claims of deliberate indifference against the individual officers, as well as claims that the City of San Antonio was liable for failing to train its officers not to hold or bind arrestees in hog-tie-like positions conducive to asphyxiation. The district court granted summary judgment to the individual police officers (Officers or Defendant Officers), concluding that they were entitled to qualified immunity, and to the city of San Antonio on the ground that the Plaintiffs had not established a city policy or custom that was the moving force behind the Officers' actions. For the reasons set forth below, we reverse summary judgment for the Defendant Officers as to the excessive force claims, affirm as to the district court's other rulings, and remand the case for further proceedings.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

In reviewing an appeal from summary judgment, we "view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *See Deville v. Marcantel*, 567 F.3d 156, 163–64 (5th Cir. 2009). The evidence presented, viewed in the light most favorable to the non-moving Plaintiffs, establishes the following:

In the early evening of April 12, 2013, the San Antonio Police Department received complaints from motorists that a man who appeared mentally disturbed, later identified as Jesse Aguirre, was walking and waving his hands near the narrow median of Highway 90. Highway 90 is a heavily

17-51031

traveled eight-lane expressway with a three-foot high cement median barrier separating its four eastbound lanes from its four westbound lanes. The first four Defendant Officers that responded to the complaints—Cristina Gonzales, Roberto Mendez, Jennifer Morgan, and Bettina Arredondo—arrived in separate vehicles on the eastbound side of the expressway opposite where Aguirre was walking eastward near the median on the westbound side.

What occurred next is documented by the videos taken by dashboard cameras in the Officers' vehicles,[1] which they left parked near the median on the eastbound side of the expressway. The videos were introduced by the Plaintiffs in opposition to defendants' motions for summary judgment.

Officer Gonzales was the first to arrive. She left her vehicle blocking the left-most eastbound lane and approached Aguirre on foot with her firearm pointed at him, ordering him to "come here" and threatening, "I'm going to shoot you, m-----r-f----r." When Aguirre did not acknowledge the command and continued to walk, Gonzales stepped over the median and followed him. Soon thereafter, Officer Morgan, pointing her gun, and Officer Mendez, pointing his taser, also approached Aguirre along the eastbound side. Aguirre then stopped, bent forward, and placed his hands on the median; Officer Gonzalez rushed forward, grabbed Aguirre's arms, and handcuffed Aguirre's hands behind him while he remained bending over the median. According to the video evidence, Aguirre did not visibly resist being handcuffed. While handcuffing Aguirre, the Officers noticed that he had fresh needle marks on his arms, indicating that he had recently used intravenous drugs.

---

[1] Though they are disturbing, the content of these videos plays a central role in our evaluation of this appeal, and we invite a reader to view the clearest and most inclusive among the videos in order to fully understand our decision. *See* Plaintiffs' Exhibit 1, available at https://www.ca5.uscourts.gov/opinions/pub/17/17-51031.mp4.

17-51031

The three Officers then pulled Aguirre over the median barrier, causing him to land on his head on the eastbound side of the expressway. The three Officers had blocked the two left-most eastbound lanes with their cars, preventing traffic from accessing the area where they held Aguirre. The Officers patted Aguirre down, finding no weapon, pulled him to his feet, walked him over to the front of Officer Mendez's car, and bent him over the hood face down with his hands cuffed behind him.

After one or two more officers arrived, they assisted in moving Aguirre from the car hood to the ground onto his stomach next to the median with his hands still cuffed behind him. The video does not show that Aguirre resisted during this maneuver, but instead that he stumbled with the Officers toward the median. After Aguirre was placed prone on his stomach, Officer Gonzales pushed his legs up and crossed them near his buttocks and kneeled forward on Aguirre's legs, holding them near Aguirre's bound hands in a hog-tie-like position. Officer Mendez knelt with one knee on the ground and the other on Aguirre's back, later changing position to hold Aguirre's shoulders and cheek down against the pavement with his hands. Officer Mendez testified that he was using part of his body weight to hold Aguirre down, thus applying pressure to Aguirre's back and neck. Officers Morgan and Arredondo then joined Gonzales and Mendez, placing their hands on Aguirre's arms and back to hold him prone in the maximal-restraint position. Several more officers arrived, and, with Aguirre still being held in that position, the group of officers milled around near where Aguirre was being held, speaking to each other and into their radios. Officer Benito Juarez, a medical tech officer, arrived after Aguirre had been placed in the prone maximal-restraint position, but the record does not disclose that Juarez offered any advice or assistance to the other Officers about the manner in which Aguirre was being held. Officer Arredondo observed that Aguirre's lips turned blue while he was held in the prone maximal-restraint position,

4

17-51031

and she thought it was the result of drugs he had taken. At some point during the Officers handling of Aguirre, they called for a police "wagon" to transport him.

The Officers held Aguirre in the prone maximal-restraint position for approximately five-and-a-half minutes, and during this time Aguirre stopped breathing. After the five-and-a-half minutes had elapsed, the Officers noticed that Aguirre was no longer breathing or responsive, and they turned him over on his back and removed the handcuffs. Juarez jogged to the trunk of his car to retrieve his medical equipment. At this point, the Officers appear to be in good spirits; according to the Plaintiffs, in the dashcam videos, Juarez can be seen smiling as he jogs to his vehicle, and several other Officers likewise appear to be smiling and laughing as they await Juarez's return around Aguirre's body. Juarez returned at a walk with his medical bag approximately one minute after he left. Aguirre remained unresponsive, leading Mendez to perform a "sternum rub"[2] in an unsuccessful attempt to rouse him. When this and similar techniques proved unavailing, Emergency Medical Services ("EMS") was contacted and one of the Officers began to attempt cardiopulmonary resuscitation ("CPR"), but she stopped after about twenty seconds. Eventually, four minutes and thirty-eight seconds after Aguirre was turned over, Juarez began administering CPR in earnest. Juarez and other Officers continued to perform CPR on Aguirre until EMS arrived, and, the video shows the Officers' body language and demeanor had changed by this time, becoming more serious and no longer smiling or laughing. The Officers were ultimately unsuccessful at reviving Aguirre. A subsequent autopsy

---

[2] "A sternum rub is the application of painful stimulus with the knuckles of closed fist to the center chest of a patient who is not alert and does not respond to verbal stimuli." Joseph Mistovich, Med, EMS1, *Misinterpreting The Results of a Sternum Rub* (June 3, 2008), https://www.ems1.com/ems-products/patient-handling/articles/misinterpreting-the-results-of-a-sternum-rub-Zk7mSQgBWXfyvygq/

5

17-51031

report concluded that the position in which the Officers had placed Aguirre had caused him to asphyxiate, stating that "[d]ue to the restraint by police, this case is classified as a homicide."

The Plaintiffs' medical expert, Dr. Brant Mittler—who reviewed, among other materials, several medical examiner reports; photographs; and autopsies; as well as the Officers' statements; statements by Aguirre's girlfriend and the officer who interviewed the Officers following the incident; and the dash cam videos—opined about the known dangers of the position in which the Officers had placed Aguirre. The position "involved pressure to . . . Aguirre's back and to his neck and his legs were pulled up backwards in the prone position. . . . over the course of over 5 minutes." According to Dr. Mittler, this positioning (1) "restricted . . . Aguirre's ability to expand his lungs and oxygenate his blood and importantly remove carbon dioxide and maintain a normal PH of his blood," (2) "reduced venous return to the heart and reduced his cardiac output," (3) "compressed his vena cava," (4) "contributed to a lowered blood PH which contributed to . . . Aguirre's death via inducement of a fatal cardiac arrhythmia," (5) induced extreme anxiety and stimulated more catecholamine production which contributed to . . . Aguirre's death," and (6) affected . . . Aguirre's ability to breathe in oxygen and expel carbon dioxide." Moreover, presumably relying of Aguirre's autopsy, Dr. Mittler noted that, "Aguirre had cocaine in his system at the time of his death," which can "increase oxygen demand and muscle fatigue," heightening the risk of asphyxiation.

Dr. Mittler also cited—and the Plaintiffs introduced into the record— a bulletin published by the United States Department of Justice that was provided to local law enforcement agencies in 1995 addressing the dangers of positional asphyxia precipitated by "cocaine-induced excited delirium," a condition Aguirre was suffering from according to his autopsy. Notably, this bulletin recommends against the use of "maximally prone restraint

17-51031

techniques" when excited delirium is evident, as, according to the bulletin, this factor is "found frequently in deaths involving positional asphyxia."[3] Additionally, the San Antonio Police Manual in effect at the time of Aguirre's death warned against using "any form or position commonly known as hog-tying" on suspects who "are violent and/or appear to be under the influence of drugs." And an officer with the San Antonio Police Department's Mental Health Detail testified that all San Antonio police officers are required to attend a 40-hour training on how to recognize "excited delirium syndrome," which included a warning that "[o]fficers need to be mindful of positional asphyxia," because prone positions "may make it more difficult for the person to breathe."

Aguirre's estate and his widow, Blanca Aguirre, on behalf of herself and as next-friend of their minor child, brought excessive force, deliberate indifference, failure to train, and Texas tort claims against the City and the Defendant Officers. The City of San Antonio and the Defendant Officers filed motions for summary judgment on all claims, which included attached affidavits by the Defendant Officers in support. The Plaintiffs responded, submitting twenty-two evidentiary exhibits, including the aforementioned dashboard camera videos taken during the incident and their experts' reports on the excessiveness of the force brought to bear on Aguirre and the manner in which it caused his asphyxiation and death. The district court dismissed the estate as a party, finding that no personal representative had yet been appointed who had the capacity to sue on the estate's behalf. The district

---

[3] The bulletin noted that "a vicious cycle" often leads to such deaths, in which a "suspect is restrained in a face-down position" and "[w]eight is applied to the person's back," causing "[t]he individual [to] experience[] increased difficulty breathing." This causes the "person [to] struggle[] more violently," which is "[t]he natural reaction to oxygen deficiency," and this struggle can in turn prompt the officer to apply "more compression to subdue the individual," exacerbating the problem.

17-51031

court then granted summary judgment to the City and Defendant Officers, finding that the Officers were entitled to qualified immunity on the Plaintiffs' excessive force and deliberate indifference claims, and that the Plaintiffs could not establish municipal liability or their state law claims. The Plaintiffs appeal.

## II. QUALIFIED IMMUNITY AND EXCESSIVE FORCE

We review the district court's grant of summary judgment *de novo*. *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact," meaning "the movant is entitled to judgment as a matter of law." *Id.* (citing FED. R. CIV. P. 56(a)). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law.'" *Bazan ex rel. Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489 (5th Cir. 2001) (emphases omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Under the doctrine of qualified immunity, "[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Thus, to establish whether the Defendant Officers are entitled to qualified immunity at the summary judgment stage, we must "engage in a two-pronged inquiry. The first asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right." *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (cleaned up). "The second prong of the qualified-immunity analysis asks whether . . . the right in question was 'clearly established' at the time of the violation." *Id.* at 656 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

17-51031

When a defendant official moves for summary judgment on the basis of qualified immunity, "the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." *Darden*, 880 F.3d at 727 (quoting *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)). In determining whether the plaintiffs have met this burden and can withstand summary judgment, however, we view all the facts "in the light most favorable to the non-moving party" and draw "all justifiable inferences" in their favor. *Id.* (cleaned up); *see* FED. R. CIV. P. 56(a).

## A. Constitutional Violation

We begin with the first prong of qualified immunity, considering whether Plaintiffs have raised a genuine issue of material fact regarding whether Aguirre's federal rights were violated. *See Darden*, 880 F.3d at 727. "When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." *Tolan,* 572 U.S. at 656 (citing *Graham v. Connor*, 490 U.S. 386, 389, 394 (1989)). The Fourth Amendment provides protections against an officer's use of excessive force to effect an arrest or other seizure. *Graham*, 490 U.S. at 389, 394. To prevail on an excessive-force claim, the plaintiff must show (1) an injury, (2) that resulted directly from an officer's use of force, and (3) that the force used was "objectively unreasonable." *Flores v. City of Palacios*, 381 F.3d 391, 396 (5th Cir. 2004). In this case, it is undisputed that Aguirre's death is a sufficient injury and that it resulted from the Officers' placing him in the maximal restraint position. Our focus is therefore on the third element: unreasonableness, or the excessiveness of placing and holding Aguirre in the prone, maximal-restraint position under the circumstances. *Cf. Goode v. Baggett*, 811 F. App'x 227, 232 (5th Cir. 2020)

(unpublished) (restricting analysis to the second two elements of an excessive force claim when the first element was uncontested).[4]

To determine whether the amount of force used was excessive, we must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tolan*, 572 U.S. at 656 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). Because this test accounts for the nature and quality of the intrusion upon an individual's Fourth Amendment rights, claims that law enforcement unreasonably employed *deadly* force— the ultimate intrusion—are treated as "a subset of excessive force" claims. *Bazan*, 246 F.3d at 487–88 (citing *Gutierrez v. City of San Antonio*, 139 F.3d 441, 446 (5th Cir. 1998)). We therefore analyze whether, taking the evidence in the light most favorable to Plaintiffs, the level of force the Officers used was unreasonably excessive to the needs of the situation, *see Graham*, 490 U.S. at 389, including whether the Officers unreasonably and unnecessarily employed deadly force against Aguirre, *see Gutierrez*, 139 F.3d at 446.

### 1. *Graham* Factors

"Excessive force claims are necessarily fact-intensive; whether the force used is excessive or unreasonable depends on 'the facts and circumstances of each particular case.'" *Darden*, 880 F.3d at 728 (cleaned up). "In making this determination, a court should consider the totality of the circumstances, 'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by

---

[4] Though *Goode* does not bind us due to its being an unpublished decision, *see Gate Guard Servs., L.P. v. Perez*, 792 F.3d 554, 561 n.3 (5th Cir. 2015) (citing 5TH CIR. R. 47.5), we find its reasoning and conclusions on many of the same issues presented in this case persuasive and correct.

17-51031

flight.'" *Id.* at 728–29 (quoting *Graham*, 490 U.S. at 396). When evaluating these factors, which the Supreme Court set forth in *Graham v. Connor*, 490 U.S. 386, 389, 394 (1989), we keep in mind that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene." *Darden*, 880 F.3d at 729 (quoting *Graham*, 490 U.S. at 396). In this case, our evaluation of each of these factors under the Plaintiffs' version of the facts indicates that the intrusion on Aguirre's Fourth Amendment interests outweighed the Officers' interest in placing and holding Aguirre in the maximal-restraint position, rendering their utilization of the technique unreasonable. *Cf. Goode*, 811 Fed. App'x at *232 (holding that officers' hog-tying of the suspect was unreasonable because, based on the *Graham* factors, they had a "relatively weak interest" in using the technique).

As to the first factor, Defendants do not attempt to show that the severity of any crime committed by Aguirre weighed in favor of the level of force used by the Defendant Officers. In fact, defendants do not articulate any criminal investigatory function justifying their actions, and instead rely on the existence of a threat to the public safety—namely, the potential danger to motorists and himself that Aguirre's mental disturbance and walking along the median of the eight-lane highway caused. At most, the crime at issue was a traffic offense. *See Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (noting that a minor traffic violation makes "the need for force substantially lower than if [plaintiff] had been suspected of a serious crime"); *Goode*, 811 F. App'x at *232 (holding that minor, nonviolent nature of suspected crime weighed against the reasonableness of hog-tying the suspect). Because the Defendant Officers do not articulate any crime supporting this element of the *Graham* analysis, we must assume that, from the point of view of a reasonable officer at the scene, Aguirre was guilty of no serious crime but, because of his mental disturbance, had put himself and others in a dangerous situation and

17-51031

required assistance. This factor thus weighs against it being reasonable or necessary to place Aguirre in the maximal-restraint position for over five minutes.[5]

In this case, the second and third *Graham* factors that we must consider—whether the level of force used was needed to mitigate an immediate threat to the Officers or public safety and whether Aguirre was resisting the Officers in such a way that the force was necessary to effect and maintain his seizure and security—overlap. *See Graham*, 490 U.S. at 396.

The Defendant Officers maintain on appeal that Aguirre's attempts to break free "posed a substantial and immediate risk of serious physical injury or death to not only the Defendants, but to innocent civilians." In their declarations below, the Defendant Officers stated that Aguirre was resisting and they feared that he would break away and run into traffic, causing a dangerous collision and potentially dragging one of the Officers with him. But the Plaintiffs' summary judgment evidence and this court's own review of the video evidence at minimum raise genuine questions about whether it was objectively reasonable to believe Aguirre was actively resisting or even physically capable of posing an immediate safety threat that would justify the Defendant Officers in using extraordinarily dangerous force by placing and holding him in the prone maximal-restraint position that led to his death.[6]

---

[5] Even if Aguirre were suspected of a serious crime, this would not necessarily be dispositive. As discussed below, using violent force to arrest an individual for even a serious crime may be unauthorized when the suspect poses no immediate safety threat and does not resist the arrest. *See Darden*, 880 F.3d at 729–31 (weighing the severity of a drug crime in favor of officers but still reversing officers' summary judgment on excessive force claim because the other two factors outweighed the seriousness of the offense factor).

[6] Officers and courts must keep in mind, that "an exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." *Lytle v. Bexar Cty.*, 560 F.3d 404, 413 (5th Cir. 2009). So even if a seized person's conduct earlier in the encounter amounted to active resistance, "the force

17-51031

As evidence in opposition to summary judgment, the Plaintiffs also offered the report of Lance Platt, Ph.D., a police excessive force expert. Platt, a former Master Police Officer and training coordinator, reviewed the police videos, the coroner's autopsy report, and the Officers' affidavits. Based on his review of the videos and the other evidence, Platt specifically controverts the Officers' averments that they had reason to be concerned that Aguirre "might break away . . . and run into traffic or drag [officers] into traffic." In Platt's assessment of the police videos, he observed that "Aguirre walked to the patrol car" after being cuffed "with no resistance surrounded by three police officers." Further, according to Platt, Aguirre "does not appear to resist in any way in the 1 minute and 4 seconds that he is held against the hood of the patrol car," and "does not physically resist at any time" while he is restrained on the ground. Platt additionally stated that, if the Officers had instead "s[a]t Mr. Aguirre up and place[d] his back against the concrete barrier when he started moaning and complaining while held face down on the pavement," "the fact that [Aguirre] was handcuffed behind his back and surrounded by five Police Officers in my opinion [would have] created an environment in which it would have been very difficult for Mr. Aguirre to stand up and escape or run into traffic." Platt elaborated that Aguirre also "could have easily . . . been walked to the back door of the Officer's patrol car and been put into the patrol car, since Officer Gonzales appears to have checked him for weapons and none were apparently located." "[T]he five officers could have safely controlled . . . Aguirre and placed him into the patrol car," he reiterated.

As related above, the Plaintiffs also introduced an expert report and deposition by Dr. Brant Mittler, a cardiologist and licensed attorney. In

---

calculus changes substantially once that resistance ends." *Curran v. Aleshire*, 800 F.3d 656, 661 (5th Cir. 2015).

13

17-51031

addition to his medical explanation of Aguirre's death that we previously recounted, Dr. Mittler provided findings, opinions, and conclusions from the police videos regarding Aguirre's lack of physical resistance throughout the encounter:

> 1. The decedent, Mr. Aguirre, never appears to resist arrest after he is pushed over the highway divider contrary to the sworn witness statements by several officers at the scene.

> 2. There is no visual evidence of kicking by Mr. Aguirre while under restraint by the SAPD officers. I see no aggressive or restrictive acts by Mr. Aguirre such as flailing of his arms or attempts to head butt or bite after he is placed in a bent over position on the police car and later restrained in a prone position.

> 3. Mr. Aguirre while in the prone position and being restrained does not appear to resist the officers who are restraining him.

> 4. Mr. Aguirre becomes limp and not moving while in the prone position under restraint by the SAPD officers.

> 5. Several minutes (approximately 4 minutes and 38 seconds) ensue between the time Mr. Aguirre become[s] limp and not moving and when the SAPD officers start[] what would be termed effective CPR.

> 6. Mr. Aguirre became unresponsive while in the prone position and being restrained by the SAPD officers. There is never a report of any viable heart rhythm after he becomes limp and unresponsive.

> 7. The restraint used by the SAPD officers involved pressure to Mr. Aguirre's back and to his neck and his legs were pulled up backwards in the prone position. This occurred over the course of over 5 minutes and was being used when he became unresponsive.

17-51031

Our own review of the video evidence from the dashboard cameras further supports the conclusion that there are genuine disputes regarding facts material to whether the Officers' use of force was excessive. The Officers contend, and the district court erroneously found, that this case is analogous to *Scott v. Harris*, 550 U.S. 372, 380 (2007), in which the Supreme Court held that the normal rules of summary judgment do not apply when undisputedly accurate video evidence blatantly contradicts a non-movant's version of events so thoroughly that it could not reasonably be believed. We emphatically disagree because in this case, the video supports rather than contradicts the non-movant Plaintiffs' account of the incident.

In *Scott*, a motorist who had been involved in a high-speed chase with law enforcement brought a § 1983 suit against an officer who rammed his car from behind, causing the motorist to run off the road and crash, which rendered him a quadriplegic. *Id.* at 375-76. The motorist argued that, prior to the officer's maneuver, his getaway had not endangered the lives of pedestrians or other motorists because the roads were nearly empty of other cars and he had maintained control of his vehicle the entire time. *Id.* He accordingly maintained that the officer's ramming his car amounted to unreasonable, excessive force in violation of his Fourth Amendment rights. *Id.* at 376. The officer moved for summary judgment and, in support, introduced a dash cam video from his patrol car that depicted, in the words of the Supreme Court, something "resembl[ing] a Hollywood-style car chase of the most frightening sort." *Id.* at 380. The video showed the motorist's "vehicle racing down narrow, two-lane roads in the dead of night at speeds that are shockingly fast. . . . swerv[ing] around more than a dozen other cars, cross[ing] the double-yellow line, and forc[ing] cars traveling in both directions to their respective shoulders to avoid being hit." *Id.* at 379. It further indicated that the motorist had "run multiple red lights and travel[ed] for considerable periods of time in the occasional center left-turn-only lane,

17-51031

chased by numerous police cars forced to engage in the same hazardous maneuvers just to keep up." *Id.* at 379-380.

On review, the Supreme Court acknowledged the normal rule that, when deciding summary judgment, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion," and that "[i]n qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Id.* at 378 (cleaned up). But the Court reasoned that the existence of an undisputedly accurate video of the incident that totally belied the motorist's claims that he was driving safely added an unusual "wrinkle" to the case. *Id.* In the highly unusual situation in which the nonmovant's story is so "utterly discredited" by evidence documenting the encounter that no reasonable factfinder could accept that version of events, the Court held, the regular rules of summary judgment must give way: "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380.

As we have since made clear, *Scott* was not an invitation for trial courts to abandon the standard principles of summary judgment by making credibility determinations or otherwise weighing the parties' opposing evidence against each other any time a video is introduced into evidence. *See Darden*, 880 F.3d at 730. Rather, *Scott* was an exceptional case with an extremely limited holding. "[A] court should not discount the nonmoving party's story unless contrary video evidence provides so much clarity that a reasonable jury could not believe his account." *Id.* When video evidence is ambiguous or in fact supports a nonmovant's version of events, *see id.*, or when there is any evidence challenging the video's accuracy or completeness, *see Scott*, 550 U.S. at 378, the modified rule from *Scott* has no application. Only when the record eliminates any feasible claim that the

16

nonmovant's account of events is true may a court disregard the normal summary judgment rule that it must credit that party's account if it is supported by sufficient evidence. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). That "difficult" and "demanding" standard for disregarding the injured person's version of the incident is clearly not met in this case.[7] *Darden*, 880 F.3d at 730.

Plaintiffs—the nonmovants in this case—contend that Aguirre was not resisting and did not pose a significant danger to the Officers, the public, or himself at the time the Officers placed him in the maximal-restraint position. Rather than "utterly discredit[ing]" the Plaintiffs' version of events, *cf. Scott*, 550 U.S. at 380, the video evidence in this case tends to support it. First, the video evidence shows that patrol cars blocked the left two of the four eastbound lanes on the highway, and that the Officers' and Aguirre's interactions took place next to the median, with the patrol cars forming a barrier between them and traffic. The video also shows that traffic had slowed considerably by the time the Officers bent Aguirre over the patrol car hood. At that point, at least five Officers were holding Aguirre motionless on the hood and several more were standing a few steps away. This period of apparent calm even before the Officers brought Aguirre to the pavement next to the median calls into question the Officers' testimony that Aguirre posed an ongoing threat of serious bodily harm to the Officers or others. *Cf. Goode v. Baggett*, 811 F. App'x at *232 (holding that a reasonable jury could find that hog-tying was excessive because suspect did not pose an immediate safety threat because "he was already handcuffed and subdued").

---

[7] The Plaintiffs did not file a cross-motion for summary judgment in this case, and so we are not called upon to decide whether their video and expert witnesses' statements provide sufficient clarity to entitle them to partial summary judgment. *Cf. Scott*, 550 U.S. at 380.

17-51031

Our review of the videos also does not indicate that Aguirre was resisting, struggling, or at all uncooperative when the Officers walked him over to the hood of the car. It is at best unclear from the video whether or how much Aguirre was moving once he was bent over the car; the video very nearly confirms that Aguirre was *not* resisting. As Dr. Mittler described, it shows no "kicking by Mr. Aguirre" nor any other "aggressive or restrictive acts . . . such as flailing of his arms or attempts to head butt or bite." Similarly, once the Officers pinned Aguirre prone on the ground, the video does not show Aguirre struggling in any way that would make the Officers' contorting and holding Aguirre's body into the hog-tie-mimicking, maximal-restraint position necessary or reasonable under the circumstances. Far from conclusively resolving factual disputes in favor of the moving party, the video evidence here weighs heavily in the Nonmovant-Plaintiffs' favor.

To summarize, the first *Graham* factor—the severity of any crime of which Aguirre was suspected—weighs in favor of it being unreasonable and excessive for the Officers to hold Aguirre in the dangerous maximal-restraint position for five and a half minutes, and there are at very least genuine disputes as to the second two *Graham* factors—whether Aguirre posed a safety threat to Officers or others or was resisting the Officer's efforts to remove him from the highway and hold him safely until the police wagon arrived.

These disputes as to material facts alone are enough to preclude a finding at summary judgment that the force used by the Officers in holding Aguirre in a hog-tie like position was constitutionally reasonable, for, under *Graham* and its progeny, it is unreasonable for an officer to use injurious force against a non-resisting, non-dangerous individual who is not suspected of a serious crime, which we must assume occurred here under Aguirre's version of events. *See, e.g., Darden*, 880 F.3d at 731 ("[A] constitutional violation occurs when an officer tases, strikes, or violently slams an arrestee who is not

18

17-51031

actively resisting arrest.""). This is especially so when the force is applied after the suspect has been restrained and subdued, as may have been the case here. *See Curran v. Aleshire*, 800 F.3d 656, 661 (5th Cir. 2015); *Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013); *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008). Indeed, several of our sister circuits have specifically applied these basic principles in cases involving maximal restraint techniques like the one the Officers employed against Aguirre.[8] *See McCue v. City of Bangor*, 838 F.3d 55, 64 (1st Cir. 2016) (holding "that exerting significant, continued force on a person's back while that person is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." (cleaned up) (quoting *Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008)); *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005) (holding that, under the *Graham* factors, officer's kneeling on the back of prone suspect who had not resisted and posed no serious threat would, if proven at trial, amount to excessive force);[9] *see also Simpson v. Hines*, 903 F.2d 400, 403 (5th Cir. 1990) (holding that police officers used grossly disproportionate, excessive force in violation of pre-trial inmate's Fourteenth Amendment rights when, in order to search the inmate and his cell, the officers cuffed his hands and legs behind his back, laid him on his stomach, and put pressure on his back, causing his asphyxiation and death). However, Plaintiffs also contend the Officers' use of force was excessive for a second reason: it amounted to the unconstitutional use of deadly force.

---

[8] The Supreme Court has recently relisted a certiorari petition raising this issue, suggesting that the Court may soon clarify the contours of an excessive force claim based on law enforcement's allegedly improper use of the maximal restraint position. *See* Petition for a Writ of Certiorari, *Jody Lombardo v. City of St. Louis*, No. 20-391 (U.S. Sept. 17, 2020).

[9] We do not adopt or rely on these out-of-circuit holdings and cite them only as confirmation of our conclusions regarding the application of Supreme Court and Fifth Circuit precedent to the Plaintiffs' version of events.

17-51031

## 2. Use of Deadly Force

Plaintiffs argue that the Officers' placing and holding Aguirre in the maximal-restraint position was an excessive and unreasonable application of deadly force. Claims that law enforcement unreasonably utilized deadly force are treated as a special subset of excessive force claims. *Gutierrez*, 139 F.3d at 446. The Supreme Court held in *Scott* that there is no "magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force,'" and such claims are broadly analyzed under the same general rubric of "reasonableness" as other excessive force claims. *Scott,* 550 U.S. at 382-83. At bottom, the Court held, a Fourth Amendment challenge to deadly force still calls for a "balanc[ing of the] nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* Nevertheless, we have long held that the use of "deadly force" is unreasonable where the officer does not have "probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others," *Gutierrez*, 139 F.3d at 446 (quoting *Garner*, 471 U.S. at 11), and we know of no case that has departed from this basic principle. *See Thompson v. Mercer*, 762 F.3d 433, 437 (5th Cir. 2014) (applying the threat of serious harm requirement to a post-*Scott* deadly force claim). And, although "[l]ower courts . . . have struggled with whether to characterize various police tools and instruments as 'deadly force,'" this court defines deadly force as force that "creates a substantial risk of death or serious bodily injury."[10] *Id.*

---

[10] Our precedents do not clearly require looking to a law enforcement officer's subjective awareness of the risks involved when determining whether a technique constitutes "deadly force," *see Gutierrez*, 139 F.3d at 446, and, as stated above, we generally evaluate excessive force claims objectively from the perspective of a reasonable officer in the situation. *Darden*, 880 F.3d at 729 (quoting *Graham*, 490 U.S. at 396). It is noteworthy, however, that the evidence indicates that the Officers were directly warned about the

17-51031

The testimony of the Plaintiffs' medical expert, Dr. Brant Mittler, evidences the substantial risk of death or serious bodily injury posed by the Officers' use of the prone maximal-restraint position under the circumstances here. Dr. Mittler detailed in his report how restraining Aguirre in that position—face-down on the pavement with his hands cuffed behind him and his legs bent up and back onto his buttocks in a hogtie-like position—and applying any force sufficient to maintain Aguirre in that maximal prone position was substantially likely to, and ultimately did, cause his death:

> 1. The prone position and pressure applied to the neck and back more likely than not restricted Mr. Aguirre's ability to expand his lungs and oxygenate his blood and importantly remove carbon dioxide and maintain a normal PH of his blood.

> 2. The bending up of Mr. Aguirre's legs in the position that they were held while he was in the prone position reduced venous return to the heart and reduced his cardiac output.

> 3. The pressure applied to Mr. Aguirre's back more likely than not compressed his vena cava and also contributed to reduced

---

dangers of putting drug-affected arrestees in the maximal-restraint position. As explained above, the Department of Justice bulletin recommends that officers "avoid the use of maximally prone restraint techniques (e.g., hogtying)," and warns that "cocaine-induced bizarre or frenzied behavior" can "increase a subject's susceptibility to sudden death" from being restrained in such a position. It is reasonable to infer that the San Antonio Police Department received this bulletin that was distributed to local law enforcement agencies across the nation, and we must make this inference in Plaintiffs favor at this stage. Further, the San Antonio Police Manual that the parties agree was in effect at the time of Aguirre's death specifically instructed its officers that, when restraining prisoners who "are violent and/or appear to be under the influence of drugs," the "[p]risoners will not have their hands and legs secured together in any form or position commonly known as 'hog-tying.'" Finally, an officer with the San Antonio Police Department's Mental Health Detail testified that all San Antonio police officers are required to attend a 40-hour training on how to recognize "excited delirium syndrome," and that training expressly warns that "Officers need to be mindful of positional asphyxia," as the prone position "may make it more difficult for the person to breath."

17-51031

blood return to his heart and reduced cardiac output and
impaired ability to correct or keep normal his blood PH.

4. More likely than not, both the positions of the legs and the
compression of the back and neck contributed to a lowered
blood PH which contributed to Mr. Aguirre's death via
inducement of a fatal cardiac arrhythmia.

5. The position he was restrained in induced extreme anxiety
and stimulated more catecholamine production which
contributed to Mr. Aguirre's death while in the restrained
position.

6. The pressure to the back of the neck applied by a SAPD
officer [Officer Mendez] affected Mr. Aguirre's ability to
breath in oxygen and expel carbon dioxide.

7. Mr. Aguirre's movements of his head from side to side prior
to death were most likely attempts to breathe in oxygen and
expel carbon dioxide prior to his death while under restraint.

Dr. Mittler also noted that the "use of stimulants such as cocaine may
increase oxygen demand and muscle fatigue," and therefore make this
method of restraint even more dangerous. Competent summary judgment
evidence indicates that the Officers had reason to know of the substantial risk
that Aguirre had recently used intravenous narcotics such as cocaine or a
similar drug and was in a state of excited delirium. In addition to Aguirre's
plainly erratic behavior in walking in a disoriented state down the middle of a
highway, Officers Morgan and Arredondo both gave sworn statements that
they suspected at the time of the incident that Aguirre was on narcotics or
alcohol. Indeed, Officer Arredondo stated that she was not alarmed when
Aguirre's lips turned blue because this was common for people under the
influence of drugs in her experience. The Texas Attorney General's report
on Aguirre's death stated that, when encountered by the Officers, Aguirre
"was completely ignoring commands and appeared to be under the influence

17-51031

of some type of controlled substance," and "as [the Officers] were handcuffing [Aguirre] they noted that he had fresh needle marks on his arms indicating some type of drug use."

Taken in the light most favorable to Plaintiffs, this summary judgment evidence indicates that a reasonable officer in the Officers' position would have known that applying the maximal-restraint position to Aguirre and holding him in this position for an extended period posed a substantial risk of causing his death or serious bodily injury. *Cf. Gutierrez,* 139 F.3d. at 446 (holding that hog-tying an apparently drug-affected individual was deadly force); *see also Cruz v. City of Laramie,* 239 F.3d 1183, 1188 (10th Cir. 2001) (holding, in an opinion by then-Fifth Circuit Chief Judge Politz, sitting by designation, that it is excessive force for an officer to hog-tie a person with apparent "diminished capacity," including from "severe intoxication, the influence of controlled substances, [or] a discernible mental condition," because the "restraint [is] likely to result in [a] significant risk to the individual's health or well-being"). And we therefore conclude that a reasonable jury could find that the Officers' use of force here constituted "deadly force." *See Flores v. City of Palacios,* 381 F.3d 391, 399 (5th Cir. 2004) (stating that whether a given technique is "deadly force" given the circumstances is a question for the factfinder); *Gutierrez,* 139 F.3d at 446 (same).

As discussed above, *see supra,* § II.A.1, the record at the very least reflects a genuine dispute of fact as to whether Aguirre was resisting or otherwise posed a threat of serious physical injury to the Officers or others so as to make the use of the prone maximal-restraint position necessary or potentially reasonable. These same factual disputes, relevant to whether the force was generally excessive to the situation, also preclude summary judgment under our case law's "deadly force" analysis. *See Gutierrez,* 139 F.3d at 446. These facts are material because, if a jury concludes that the

17-51031

Officers had reason to believe Aguirre was on drugs and that he posed no threat of serious bodily harm at the time the Officers used the maximal restraint position against him, the Plaintiffs will have established that the Officers violated Aguirre's constitutional right to be free from the unreasonable use of deadly force. *See id.*

In sum, facts material to whether the Officers violated Aguirre's Fourth Amendment rights are genuinely disputed. The lack of visible resistance by Aguirre, the presence of numerous Officers surrounding him, and the fact that the Officers had already blocked off several lanes and caused traffic to slow significantly all weigh against the inference of any immediate safety threat or other need that would justify placing Aguirre in the prone maximal-restraint position. "[A] jury could conclude that no reasonable officer would have perceived [Aguirre] as posing an immediate threat to the officers' [or his own or the public's] safety," *Darden*, 880 F.3d at 729, meaning that the Officers' use of what may have amounted to deadly force was necessarily excessive of any need to mitigate a public safety threat. Likewise, "a jury could conclude that no reasonable officer on the scene would have thought that [Aguirre] was resisting arrest," *id.* at 730, meaning that the use of force far exceeded the amount necessary to effect Aguirre's arrest or ensure his safety. Although the Officers presented their own version of events that included claims of Aguirre's resistance—including, for example that he "was resisting and trying to pull away from" the Officers while walking near the westbound side of the median, "was still resisting" when placed on the hood of the car, and "continued to resist by shifting his body around and trying to break free" while pinned against the hood of the patrol car—these averments in contravention of what the police dashcam videos show do no more than reinforce that genuine disputes as to material facts exist at this stage of the litigation.

17-51031

## B. Violation of Clearly Established Law

Officers' conduct violates a clearly established right when there is "controlling authority . . . that defines the contours of the right in question with a high degree of particularity." *Linicomn v. Hill*, 902 F.3d 529, 538 (5th Cir. 2018) (citations and internal quotations marks omitted). "'[C]learly established law' should not be defined 'at a high level of generality.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). But it is not necessary that a previous case presenting identical facts exist in order for a right to be clearly established. "'The central concept is that of fair warning: The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Trammell v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017) (*quoting Ramirez*, 716 F.3d at 379). As set out below, I conclude that this court's precedents demonstrate that, if they indeed employed excessive and deadly force in the specific manner that Plaintiffs contend they did, the Officers had "'fair warning' that their conduct was unconstitutional." *Trammell*, 868 F.3d at 343.

"[I]n an obvious case, the *Graham* excessive-force factors themselves can clearly establish the answer, even without a body of relevant case law." *Darden*, 880 F.3d at 733 (citing *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)). "The law is clear that the degree of force an officer can reasonably employ is reduced when an arrestee is not actively resisting." *Id.* It has long been clearly established that, when a suspect is not resisting, it is unreasonable for an officer to apply unnecessary, injurious force against a restrained individual, even if the person had previously not followed commands or initially resisted the seizure. *See Aleshire*, 800 F.3d at 661 (holding that it was clearly established on the basis of the *Graham* factors alone that it was excessive and unreasonable for an officer to bang an arrestee's head against a wall after she

25

Case 5:15-cv-00371-DAE   Document 85   Filed 05/14/21   Page 28 of 44
Case: 17-51031      Document: 00515862837      Page: 26      Date Filed: 05/14/2021

17-51031

had ceased resisting). Indeed, at least five other circuits have held that, even in the absence of a previous case with similar facts, "it [is] clearly established . . . that exerting significant, continued force on a person's back while that person is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." *McCue*, 838 F.3d at 64 (cleaned up) (collecting cases, including *Abdullahi*, 423 F.3d at 765; *Weigel*, 544 F.3d at 1155; *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1057 (9th Cir. 2003); and *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004)).

As discussed, "a jury could conclude that no reasonable officer would have perceived [Aguirre] as posing an immediate threat to the [O]fficers' safety or thought that he was resisting arrest." *Darden*, 880 F.3d at 733. Thus, if the Officers unnecessarily placed Aguirre in the maximal-restraint position when there was no reason to believe he had committed a serious crime, that he posed a continuing threat to the Officers or public safety, or that he was resisting the Officers' seizure or holding of him, the Officers violated Aguirre's clearly established constitutional rights. *See id.* (holding officer's conduct would violate clearly established rights if he used violent force against plaintiff who did not resist and presented no safety threat); *Aleshire*, 800 F.3d at 661 (same).

But I need not rely solely on the *Graham* factors to find a violation of clearly established law. Plaintiffs' claim that the Officers unconstitutionally employed deadly force in the absence of any threat of death or serious injury to the Officers or the public presents facts very similar to those found in *Gutierrez v. City of San Antonio*, 139 F.3d 441 (5th Cir. 1998). *Cf. Goode*, 811 Fed App'x at *230, *236 (affirming the district court's determination that *Gutierrez* was "adequate authority at a sufficiently high level of specificity to put the Officers on notice that hog-tying would violate clearly established law in some situations" (internal quotes omitted)). In *Gutierrez*, two officers—

17-51031

also with the San Antonio Police Department—found Rene Gutierrez disoriented in the middle of the street, cuffed his hands behind his back, and put him in the backseat of the patrol car to transport him to the local hospital, believing he was either "having psychiatric problems" or "a reaction to bad drugs." *Id.* at 443. When he "began to kick the back of the driver's seat, the metal cage, and the windows of the patrol car with his bare feet," the officers determined Gutierrez needed to be further restrained "for his safety and ours," and they accordingly tied his feet together and to his handcuffs behind his back in a "hog-tie" and placed him in the backseat. *Id.* When they arrived at the hospital, Gutierrez was dead. *Id.* The autopsy report stated: "It is known that 'hog tying' of an individual and placing them in the position that Rene Gutierrez was placed[ in] can produce a relative hypoxia and in some instances death," and the report cited this restraint position as a "contributory cause" of his death. *Id.* at 444.

On review, this court observed that Gutierrez's family had introduced "evidence into the summary judgment record . . . indicating that the combination of hog-tying a drug-affected person in 'cocaine psychosis' (excited delirium) and 'positional asphyxia' (placing them in a face-down prone position) can lead to death." *Id.* We therefore affirmed the district court's denial of qualified immunity for the officers, holding that, when drawing all reasonable inferences in the light most favorable to the Plaintiffs, "hog-tying in these circumstances would have violated law clearly established prior [to the incident in 1994]." *Id.* at 446–47. The court noted in *Gutierrez* that its holding applied to "a limited set of circumstances—*i.e.*, when a drug-affected person in a state of excited delirium is hog-tied and placed face down in a prone position." *Id.* at 451.

As in *Gutierrez,* the Plaintiffs here introduced evidence that a reasonable officer would have reason to know that Aguirre had used drugs, including testimony from the Officers that they did actually suspect Aguirre

was on narcotics or alcohol at the time, and a Texas Attorney General Report stating that Aguirre appeared to be under the influence of some type of controlled substance and that the Officers noticed that Aguirre had fresh needle marks on his arms. The only difference between the hog-tie position used in *Gutierrez* and the prone maximal-restraint position used here is that Aguirre's arms and legs were not mechanically bound to one another. *See Hill v. Carroll Cty.*, 587 F.3d 230, 232 n.1 (noting "four-point restraint" or "hog-tying" is "binding the arms and legs together behind the back with an additional set of handcuffs"). But in addition to being proned-out next to the median, Aguirre's hands were cuffed behind his back, and the Officers pushed and held Aguirre's legs up near his buttocks in the same position they would have been in had his legs been physically bound to his hands. The effects of the restraints were the same and the slight variation in the technique is immaterial. As this court held in *Gutierrez* in 1998, it is clearly established that the use of hog-tie-like restraint may amount to deadly force "in a limited set of circumstances"–that is, when employed against an individual who a reasonable officer would have cause to know is "a drug-affected person in a state of excited delirium"—and there is a clearly established Fourth Amendment right to be free from the use of such deadly force when there is no probable cause to believe the force is necessary to ameliorate a threat of death or serious bodily injury. *Gutierrez*, 139 F.3d at 451.

I recognize that this court has distinguished *Gutierrez* in factual scenarios different from the case at bar. In *Hill v. Carroll County*, for example, this court stated that "*Gutierrez* does not hold four-point restraint a per se unconstitutionally excessive use of force, nor does it extend beyond its facts as a mirror of the then-unchallenged San Diego Study" on which the Plaintiffs relied in *Gutierrez*. 587 F.3d at 235. Instead, according to this court in *Hill*, "neither the San Diego Study nor *Gutierrez* raises a triable fact issue

17-51031

in this case *where there is no evidence of drug abuse or drug-induced psychosis.*"
*Id.* (emphasis added). But this goes not to the question of whether the law
against the use of deadly force was clearly established, but rather to whether
the use of a hog-tie under those circumstances constituted deadly force—an
issue we have held is a question for the jury that is based on the evidence in
the case. *Gutierrez,* 139 F.3d at 446. *Hill* therefore simply addressed the
plaintiffs' failure to introduce evidence that a reasonable officer would have
known that placing the individual in a hog-tie like position posed a risk of
death or serious bodily injury, and it does not weigh against the conclusion
that, when the evidence shows that the use of a hog-tie-like position does
meet this test—and thus meets the constitutional standard for deadly force—
the right to be free from such force when it is not reasonable or necessary is
clearly established.

Here, of course, unlike in *Hill,* the Plaintiffs point to evidence that
Aguirre suffered from drug abuse and drug-induced psychosis and that a
reasonable officer would have known this, including from his erratic conduct
that actually lead the Officers to believe he was under the influence of drugs
and from his blue lips and the fresh needle marks that the Officers noticed on
his arms. *See supra,* note 10. And, as discussed in detail *supra,* § II.A.2, the
Plaintiffs introduced a wealth of evidence from which a reasonable juror
could conclude that the use of a hog-tie-like position in these circumstances
was deadly force, including the opinion of a medical expert and a Department
of Justice bulletin addressing the dangers of positional asphyxia when the
maximally prone restraint position is used on detainees who suffer from
"cocaine-induced excited delirium." *Hill* is therefore inapposite.

Similarly, in *Khan v. Normand,* this court held that no clearly
established right had been violated through the use of a hog-tie where the
arrestee in that case "forcefully resisted his removal . . . . thrashing his legs;
attempting to bite; and, . . . reaching for an officer's gun belt." 683 F.3d at

17-51031

193. This court in *Khan* distinguished *Gutierrez* in three ways: (1) "the brevity of Khan's restraint and the constant supervision" was unlike *Gutierrez* because Gutierrez was placed unattended in the back of a patrol vehicle; (2) *Gutierrez* relied on a study—the San Diego Study—that "has been called into question by more recent scholarship"; and (3) "*Gutierrez* dealt with officers who knew the decedent had . . . 'shot some bad coke,'" whereas the record in *Khan* "contain[ed] no similar knowledge by the officers in the field, despite the subsequent autopsy report that found methamphetamine in his system." *Id.* at 195–96.

Two of the distinctions *Khan* drew to *Gutierrez* are inapplicable here. As discussed, the use of the San Diego Study bears only on the factual question of whether the use of a hog-tie-like restraint amounted to deadly force and not the legal question of whether it was clearly established that the use of such force is unconstitutional when there is not probable cause to believe it is necessary to prevent serious harm to officers or others. Again, Plaintiffs did not rely on the San Diego Study here, but rather introduced a medical expert's opinion, a Department of Justice bulletin, passages from the San Antonio Police Manual, and testimony by an officer with the San Antonio Police Department's Mental Health Detail. And, again, unlike in *Khan* or *Hill*, the plaintiffs here introduced evidence that a reasonable officer in the Officers' position would—and the Officers in fact did—suspect that Aguirre had used drugs, increasing the risk that using the maximal-restraint position against him would result in his death or serious bodily injury. Combined, this evidence is sufficient to at minimum raise a question for the jury as to whether the force used in this case was deadly in the constitutional sense. We must take this fact as true for summary judgment purposes, including for the purpose of determining whether the Officers actions violated clearly established law at the time of the incident. The Officers will have an opportunity to rebut Plaintiffs significant evidence on these points at trial.

17-51031

*See Gutierrez*, 139 F.3d at 451 (noting that, at trial, "a very different picture may result than the one painted by the summary judgment record because Gutierrez must prove the issues that this opinion assumes in his favor").

I acknowledge that the duration of the deadly force incident—here, five and a half minutes—was shorter than the incident in *Gutierrez*, and that *Khan* distinguished the facts there on that basis. *See Khan*, 683 F.3d at 195. But in *Khan*, the arrestee stopped breathing "[a]lmost immediately" after he was placed in a four-point restraint. *Id.* at 193. Not so here, as the Officers kept Aguirre in the prone maximal-restraint position for five and a half minutes. And Dr. Mittler opined that "Aguirre should not have been restrained in the prone position for a prolonged period of time with pressure on his back and neck and his legs bent up backwards and *with no monitoring of his respirations and consciousness.*" Taking the evidence in the light most favorable to the Plaintiffs at the summary judgment stage, then, the Officers failed to properly monitor Aguirre as they held him in a hog-tie like position, resulting in a situation like the one considered in *Gutierrez* and unlike that in *Khan*.

My analysis reveals that the distinctions from *Gutierrez* drawn by this court in *Hill* and *Khan* do not exist here, and their absence is dispositive of the question of whether the law prohibiting the use of a hog-tie-like restraint under these circumstances was clearly established at the time of the Officers' actions. My reasoning is confirmed by our court's recent unpublished decision in *Goode v. Baggett*, in which we reaffirmed that *Guiterrez* "remains binding precedent": "We conclude that *Gutierrez* clearly established the unlawfulness of hog-tying in certain circumstances." 811 F. App'x 227, 236 (5th Cir. 2020). Because in that case it was at least genuinely disputed whether there was reason to believe the arrestee was drug-affected, whether he posed a threat to anyone, and whether the officers had closely monitored his status while he was in the hog-tie position, the court determined that

31

17-51031

summary judgment was inappropriate because there were disputes as to whether the officers had violated clearly established law. *Id.* at 236-37; *see also Pratt v. Harris Cnty.*, 822 F.3d 174, 185 (5th Cir. 2016) (Costa, J., concurring) (stating that law against using hog-tie under circumstances present in that case was not clearly established specifically because the arrestee was resisting, the officers closely monitored the arrestee, and the officers did not have reason to believe the arrestee was in a drug-induced psychosis). As stated, *see supra* note 4, *Goode* is not binding precedent, but it is persuasive, and I agree with its reasoning and conclusions.

Though the facts here are not identical to *Gutierrez*, we need not find the facts to be precisely the same as a previous case to hold that the Officers would have had "fair warning" that their handling of Aguirre was dangerous, unnecessary, and unconstitutional under the circumstances. *Trammell*, 868 F.3d at 343. The central holding in *Gutierrez* remains intact: "hog-tying may present a substantial risk of death or serious bodily harm . . . in a limited set of circumstances—*i.e.*, when a drug-affected person in a state of excited delirium is hog-tied and placed face down in a prone position." *Gutierrez*, 139 F.3d at 451. And, as already established, a reasonable jury could conclude that the maximal prone restraint position was tantamount to and as dangerous as a hog-tie. I therefore conclude Aguirre's right to be free from this position under the facts we must accept here—where he was not resisting, posed no immediate safety threat, and was presenting reasons to believe he was on drugs and in a drug-induced psychosis—was clearly established at the time of the incident.

Based on the foregoing, the Officers who participated in bringing Aguirre to the ground and restraining him in the prone maximal-restraint position—Officers Gonzales, Mendez, Morgan, and Arredondo—are not entitled to summary judgment on the basis of qualified immunity because

17-51031

genuine disputes exist regarding whether they violated Aguirre's clearly established Fourth Amendment rights.

## III.   DELIBERATE   INDIFFERENCE   AND   QUALIFIED IMMUNITY

Notwithstanding the foregoing, we affirm the district court's grant of summary judgment on the Plaintiffs' deliberate indifference claims. Unlike our inquiry into whether officers used excessive force, which judges "[t]he 'reasonableness of a particular use of force . . . from the perspective of a *reasonable officer* on the scene," *Darden*, 880 F.3d at 729 (emphasis added), and our qualified immunity analysis, which asks whether "[t]he contours of the right [are] sufficiently clear that a *reasonable official* would understand that what he is doing violates that right," *Anderson*, 483 U.S. at 640 (emphasis added), the Fourteenth Amendment's deliberate indifference inquiry turns on law enforcement officials' "*subjective knowledge*." *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 650 (5th Cir. 1996) (en banc). Law enforcement officials violate an arrestee's Fourteenth Amendment due process rights when they have "subjective knowledge of a substantial risk of serious harm to a pretrial detainee but respond[] with deliberate indifference to that risk." *Id.* Negligence or even gross negligence is not enough: the officials must have had actual knowledge of the substantial risk. *Id.* (stating that "the Due Process Clause forbids the 'punishment' of pretrial detainees" and "[a]n official's failure to alleviate a significant risk that he should have perceived but did not . . . cannot under our cases be condemned as the infliction of punishment" (quoting *Farmer v. Brennan*, 511 U.S. 825, 838 (1994)). Nonetheless, a subjective intent to cause harm is not required. *Garza v. City of Donna*, 922 F.3d 626, 634, 636 (5th Cir. 2019).

On appeal, Plaintiffs do not even claim, much less offer evidence to demonstrate, that any of the Officers were actually aware that Aguirre was

17-51031

losing consciousness or otherwise in danger. The Officers have consistently asserted, and the video evidence does not otherwise indicate, that none of them knew Aguirre was in medical distress until he became unresponsive. They stated that he continued to talk, yell, and move his head while on the ground, so they believed he was able to breathe. The Officers testified that they believed Aguirre's groaning and discolored lips were due to heavy drug use, not asphyxiation, and Plaintiffs do not offer evidence to dispute these accounts. Even if these asserted beliefs were unreasonable and their actions contrary to what they should have known from their training, that can only at most establish gross negligence, not the required deliberate indifference. Because Plaintiffs do not cite to, and we have not identified, any evidence that the Defendant officers were aware that Aguirre was in danger until he became unresponsive, we affirm the district court's grant of summary judgment on this claim.

Once the Officers realized Aguirre was unresponsive, however, there was a delay of several minutes before effective CPR was administered. Plaintiffs claim that Defendants were deliberately indifferent to Aguirre's serious medical needs by delaying CPR once they assessed that he was not breathing. Plaintiffs' medical expert points out that "[t]here appears to be a delay of approximately 4 minutes and 30 seconds from the time the SAPD officers turn . . . Aguirre on his back to when functional CPR started," and that there was a mere "half hearted attempt at a few chest compressions" within three minutes of turning Aguirre over and seeing he was unresponsive, but effective CPR was not started for four and a half minutes.

Delay of medical care can result in liability where there has been deliberate indifference, in that the officers were subjectively aware of the risk of serious harm but disregarded it. *See Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006). And "knowledge of a substantial risk of harm may be inferred if

Case 5:15-cv-00371-DAE   Document 85   Filed 05/14/21   Page 37 of 44
Case: 17-51031      Document: 00515862837      Page: 35      Date Filed: 05/14/2021

17-51031

the risk was obvious." *United States v. Gonzales*, 436 F.3d 560, 573 (5th Cir. 2006); *Easter*, 467 F.3d at 463.

But Plaintiffs have not established that the Officers were deliberately indifferent to the risk to Aguirre's health after they discovered he was no longer breathing. This is not a case where the Officers elected to do nothing in response to a known health risk. *Cf. Easter*, 467 F.3d at 463–64 (allowing deliberate indifference claim to go forward where "it [could] be inferred from the circumstances that [the official] was subjectively aware of a substantial risk of harm to [the inmate's] health" yet did not assist). The videos illustrate, and Plaintiffs do not contest, that once the Officers discovered Aguirre was unresponsive, they flipped him over, unhandcuffed him, and Officer Juarez, the medic on the scene, went to retrieve his medical equipment. Juarez can be seen in the videos jogging to the trunk of his car to get medical equipment, returning just over a minute later. Approximately one minute after he returned, Officer Mendez performed a sternum rub, and approximately another minute thereafter, the Officers began full CPR, with continuous chest compressions until EMS arrived.

While these measures may have been inadequate, Plaintiffs do not present any evidence that the Officers *knew* they were insufficient and intentionally failed to do more out of indifference to Aguirre's well-being. Plaintiffs point to the Officers demeanor in the dashcam video, arguing that their smiling and laughing suggests that they did not care about the obvious risk to Aguirre's health. However, the video depicts this behavior *before* Juarez's initial efforts to revive Aguirre were unsuccessful. The Officers quickly took on a sober aspect as Aguirre remained unresponsive, which suggests their initial manner was the result of subjective unawareness of the risk rather than knowledge of the risk and a deliberate choice not to take any precautions against the realization of the danger's fatal consequences. To be sure, we do not condone the Officers light-hearted attitudes, and it may well

17-51031

have been objectively unreasonable for them to have been ignorant of the serious threat to Aguirre's health. But gross negligence on the part of the Officers is not sufficient to establish the kind of subjective, deliberate indifference that must be demonstrated to establish a Due Process violation. *Hare*, 74 F.3d at 650. Accordingly, we affirm the district court's finding of qualified immunity on these claims.

## IV.   MUNICIPAL LIABILITY

"To state a claim against a municipality under 42 U.S.C. § 1983, a plaintiff must allege that there was either an official policy or an unofficial custom, adopted by the municipality, that was the moving force behind the claimed constitutional violation." *Thompson v. Mercer*, 762 F.3d 433, 441–42 (5th Cir. 2014) (citations and internal quotation marks omitted).

The only support the Plaintiffs provide on appeal for their municipal liability claim is that the Chief of Police "signed off on a custodial death report submitted to the Texas Attorney General, which included false information and never took any steps to correct or remediate this filing after the officers retracted their sworn after-incident statements." The Plaintiffs contend, without further explanation, that this act "can only be interpreted as an endorsement and ratification of a policy and custom not to discipline officers that violate the rights and well-being of the citizens they have sworn to protect."[11] Even if this example was sufficient to establish the existence of

---

[11] The Plaintiffs make passing reference to a "failure to train" claim against the municipality. To the extent the Plaintiffs are asserting a separate claim based on San Antonio's alleged failure to train officers not to employ the prone maximal-restraint position in these circumstances, they have not argued that the city had notice of a pattern of constitutional violations and remained deliberately indifferent to the need to train officers to avoid such techniques. The Plaintiffs have therefore failed to establish municipal liability based on any failure of San Antonio to train its police officers. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).

17-51031

such a policy or custom, the Plaintiffs make no attempt to demonstrate, as is also required, that this alleged custom was "the moving force behind the claimed constitutional violation." *Thompson*, 762 F.3d at 441. Accordingly, we affirm the district court's dismissal of the Plaintiffs' municipal liability claim.

## V. TEXAS TORT CLAIMS ACT

The Plaintiffs also reassert state law claims against the City under the Texas Tort Claims Act (TTCA). Section 101.021(2) of the TCCA "waives governmental immunity for certain negligent conduct, but does not waive immunity for claims arising out of intentional torts." *City of Watauga v. Gordon*, 434 S.W.3d 586, 594 (Tex. 2014); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(2), 101.057. As the district court correctly framed it, "intentional conduct, no matter how it is pled, falls under the TTCA's sovereign immunity waiver exception." *See Tex. Dep't of Pub. Safety*, 44 S.W.3d at 580.

The Plaintiffs argue that their claim for "negligent use of handcuffs" is not an intentional tort because they "are not contending that the officers *intended to kill* Aguirre but rather than their lawful albeit negligent actions . . . nonetheless set into motion foreseeable physiological stresses that caused Aguirre's death." However, this argument is contrary to foundational tort law principles, which maintain that the intentional tort of battery lies where the *offensive contact* is intentional, not the resulting injury. *See generally Vosburg v. Putney*, 50 N.W. 403 (Wis. 1891). Plaintiffs do not and cannot dispute that putting Aguirre in handcuffs, bringing him to the ground, and applying pressure to his legs and back was intentional conduct by the Officers that they allege caused his death: a quintessential intentional tort claim. Consistent with these principles, Texas courts have repeatedly rejected the argument that intentional conduct by police that also forms the basis of

37

17-51031

excessive force claims, including the use or non-use of handcuffs, can give rise to cognizable claims under the TCCA. *See, e.g., City of Garland v. Rivera*, 146 S.W.3d 334, 338 (Tex. App. 2004) *City of Laredo v. Nuno*, 94 S.W.3d 786, 789 (Tex. App. 2002). Accordingly, the alleged intentional acts of the Officers falls under the TTCA's sovereign immunity waiver exception, and we affirm the district court's denial of Plaintiffs' TTCA claims.

## VI.  DISMISSAL OF AGUIRRE'S ESTATE AS A PLAINTIFF

Plaintiffs also argue that the district court erred by dismissing the Estate of Aguirre as a named plaintiff, leaving Blanca Aguirre as Plaintiff "individually and as next friend" of her and Aguirre's minor son. Since the district court's dismissal of the case in May 2017, a Texas probate court has appointed Blanca the Dependent Administrator and issued Letters of Administration, effective February 2018. Plaintiffs move in this court to supplement the record with the probate court's order and Letters of Administration and request that we take judicial notice of them. We hereby GRANT the motion to supplement the record and DENY the motion to take judicial notice as moot.

However, Blanca Aguirre's subsequent appointment as the Estate's Administrator does not retroactively render the district court's dismissal of the Estate as a party incorrect. Under Texas law, a deceased's estate is not a legal entity and may not properly sue or be sued as such. *See Price v. Estate of Anderson*, 522 S.W.2d 690, 691 (Tex. 1975)); *see also Robertson v. Wegmann*, 436 U.S. 584 (1978) (survival actions under [42 U.S.C.] § 1983 are governed by 42 U.S. § 1988, which directs the court to look to the law of the forum state). An estate only has the capacity to sue through either its legally appointed legal representative or an heir who can demonstrate that there is "no administration pending and none [is] necessary." *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848–49 (Tex. 2005). The district court did not

17-51031

err in determining that, on the record before it, Blanca Aguirre was neither the administrator nor an heir who could demonstrate that no administration was pending, and that the Estate was thus without capacity to bring suit.

There is no indication that the district court dismissed the Estate with prejudice. On remand, therefore, Plaintiffs could seek to add the Estate as a party once more, this time with Blanca Aguirre as the now properly appointed administrator. *See Austin*, 171 S.W.3d at 846 ("later-acquired status as the estate's personal representative . . . related back to the time of the lawsuit's original filing") (citing *Shepherd v. Ledford*, 962 S.W.2d 28, 31–32).

***

For these reasons, we VACATE the district court's entry of summary judgment on the Plaintiffs' excessive force claims against Defendant Officers Gonzales, Mendez, Morgan, and Arredondo, affirm the district court's summary judgment in favor of Officer Juarez and the City of San Antonio and as to the Plaintiffs' deliberate indifference claims, and REMAND for further proceedings consistent with this opinion.

17-51031

E. GRADY JOLLY, *Circuit Judge*, concurring in the judgment:

The question here is excessive force, *vel non*. The force applied to subdue Aguirre cannot be properly evaluated without an appreciation of the context: a busy highway, cars at high speeds, and a suspect wandering in and out of lanes of traffic. During the event, a wreck occurred nearby. And once Aguirre was apprehended and placed on the hood of a police car, he attempted to break away from the officers in the midst of the traffic. In short, the context could hardly have been more tense, fast-moving, and dangerous.

Because I view these facts differently from Judge Dennis, I believe that the restraint the officers employed was initially a justified use of force. This force may have even been justified for a brief period after Aguirre was thrown to the ground: to me, the video indicates that Aguirre may have continued resisting for a bit. But there is a good deal that is going on that has not been captured by the camera and cannot clearly be discerned.

After about three minutes, however, Aguirre was surrounded by nine officers, only three of whom were restraining him—and by that point, he does not appear to be resisting much, if at all. Multiple officers are seen mulling around. So it would appear that, with the additional surveilling officers, the need for the extreme restraint may have lessened. Despite this change, the officers continued to apply the maximal restraint position for another two minutes.

For those two minutes, there is a material factual dispute as to whether the restraint continued to be necessary to keep Aguirre from fleeing, given the number of officers available to prevent Aguirre from bolting into traffic. This disputed issue of fact requires a full airing of all the evidence before a fact-finder. Were a jury to find that the restraint used became, at some point, unnecessary to keep Aguirre from escaping into traffic, continuing this restraint against this particular person with some known health risks would constitute excessive force as a matter of law because an objective, reasonable

17-51031

officer would know that such force would not constitute a measured, appropriate degree of force. *See Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 333–34 (5th Cir. 2020). Excessive force is unreasonable; unreasonable force, unconstitutional.

Furthermore, if a jury concludes that the restraint was unnecessary, it would have been "obvious" to a reasonable officer that the use of such a severe tactic against this particular person would be constitutionally proscribed, and he would have no recourse to qualified immunity. *See Taylor v. Riojas*, 141 S. Ct. 52, 52–54 (2020).

I therefore concur with the result reached.

17-51031

STEPHEN A. HIGGINSON, *Circuit Judge*, concurring in the judgment:

I write separately only as to our reversal of the district court's grant of summary judgement on qualified immunity grounds with respect to the plaintiffs' excessive force claims. I concur on the narrow ground that our court's clearly established law, though lacking clarity in some respects, had converged by spring of 2013 to stand at least for the proposition that police officers use constitutionally excessive force when they put a handcuffed arrestee, no longer resisting or posing a safety threat to himself or others, and whom the officers observed in an excited state of delirium and suspected to have ingested drugs, on the ground, face down in an asphyxial position, i.e., pulling back his leg and arms into prone restraint, and simultaneously apply vertical pressure to such a prone, immobile arrestee for sufficient time to see his lips turn blue and his breathing stop.

Put otherwise, our caselaw had converged by spring 2013 around the clearly established proposition that while such an initial restraint is not per se unconstitutional, the continued application of asphyxiating force may be unreasonable where there is no ongoing threat posed by the suspect. *See Pratt v. Harris County*, 822 F.3d 174, 184 (5th Cir. 2016) (reviewing caselaw to conclude use of prone restraint was not excessive due to evasion and violence, and where additional force applied to back was brief); *Khan v. Normand*, 683 F.3d 192, 195–96 (5th Cir. 2012) (reviewing same body of law to conclude brief use of prone restraints, without additional force, was reasonable).

Of course, this evidence of police suffocation of a restrained, prone suspect is in the light most favorable to plaintiffs. One or more circumstance may prove untrue whereupon qualified immunity may attach. *See Darden v City of Fort Worth*, 880 F.3d 722, 732 (5th Cir. 2018).